**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| *Plaintiff,* | |
| **v.** | **Case No. 21-cr-423 (RC)** |
| **RICKY C. WILLDEN** | |
| *Defendant.* | |

<u>**MEMORANDUM IN AID OF SENTENCING**</u>

Ricky Christopher Willden, by and through his attorney, Assistant Federal Defender Griffin Estes, hereby submits this memorandum in aid of sentencing in this matter. Pursuant to the sentencing factors set forth in 18 U.S.C. § 3553(a) as delineated in *Rita v. United States*, 551 U.S. 338 (2007), *Kimbrough v. United States*, 552 U.S. 85 (2007), *Gall v. United States*, 552 U.S. 38 (2007) and *Nelson v. United* States, 555 U.S. 338 (2009), Ricky ('Chris') Willden respectfully requests this Court impose a sentence of twelve months and one day in the Bureau of Prisons followed by two years of supervised release. As a condition of supervised release, Mr. Willden asks the Court to order that he participate in a thirteen-month substance abuse treatment program.  Given the unique facts and circumstances of Mr. Wilden's case, pursuant to the U.S. Constitution and 18 U.S.C. § 3553(a), the aforementioned sentence represents the sentence that is sufficient but not greater than necessary to accomplish the goals of federal sentencing.

//

//

1

## **TABLE OF CONTENTS**

I - Introduction. ..................................................................................................................5

II - Procedural History ........................................................................................................6

III – Plea Agreement. ..........................................................................................................6

IV - Applicable Legal Principles. ........................................................................................7

V – Mr. Willden's History and Characteristics Support a Downward Variance. ...........................8

VI – The Offense Conduct ................................................................................................16

VII – A Twelve Month Sentence, Followed By a Mandatory Thirteen Month Inpatient Program as a Condition of Supervised Release Is a Reasonable Sentence. ..................................................17

VIII – Conclusion ..............................................................................................................23

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Cunningham v. California*
549 U.S. 270 (2007)..........................................................................................................8

*Gall v. United States*
552 U.S. 38 (2007)........................................................................................................1, 21

*Kimbrough v. United States*
552 U.S. 85 (2007)......................................................................................................1, 8, 9

*Nelson v. United* States
555 U.S. 338 (2009)..........................................................................................................1

*Pepper v. United States*
562 U.S. 476 (2011)..........................................................................................................9

*Rita v. United States*
551 U.S. 338 (2007)..........................................................................................................1

*Santosky v. Kramer*
455 U.S. 745 (1982).........................................................................................................21

*United States v. Autrey*
555 F.3d 864 (9th Cir. 2009)...........................................................................................20

*United States v. Baker*
445 F.3d 987 (7th Cir. 2006)...........................................................................................21

*United States v. Booker*
543 U.S. 220 (2005)..........................................................................................................7

*United States v. Collington*
461 F.3d 805 (6th Cir. 2006)...........................................................................................20

# TABLE OF AUTHORITIES

## FEDERAL STATUTES AND RULES

United States Code

18 U.S.C. § 111...........................................................................................6, 7, 8, 21, 22

18 U.S.C. § 231 ...................................................................................................................6

18 U.S.C. § 1512..............................................................................................................21

18 U.S.C. § 1752 ...............................................................................................................6

18 U.S.C. § 3553.................................................................................................1, 5, 7, 21

40 U.S.C. § 5104 ...............................................................................................................6


United States Sentencing Guidelines

§2A2.2(a) ...........................................................................................................................7

§2C1.1................................................................................................................................7

## MISCELLANEOUS

Vincent J. Felitti, M.D., FACP, et al., *Relationship of Childhood Abuse and
Household Dysfunction to Many of the Ladings Causes of Death in Adults:
The Adverse Childhood Experiences (ACE) Study*
14 Am. J. Preventive Med. 245 (1998)............................................................................13

Karen Hughes, et al., *The effect of multiple adverse childhood experiences on health:
a systematic review and meta-analysis*, 2 The Lancet e356 (Aug. 2017).......................13

Hannah W. Jones, Andy C. Dean, Kimberly A. Price & Edythe D. London (2016)
*Increased self-reported impulsivity in methamphetamine users maintaining drug
abstinence*, The American Journal of Drug and Alcohol Abuse ....................................15

I K Lyoo et al., *Predisposition to and effects of methamphetamine use on the
adolescent brain*, 20 Molecular Psychiatry 1516 (2015).................................................15

*Preventing Adverse Childhood Experiences (ACEs): Leveraging the Best Available
Evidence*, The Centers for Disease Control & Prevention (2019)....................................13

**I - Introduction.**

At 41 years old, Chris is pending sentencing for the first time. Given the circumstances in which he was raised, Chris managed to, for the past four decades, have a remarkably positive impact on his community, his family and those around him.  Subject to abuse and neglect, and surrounded by drug abuse, Chris was forced to raise himself from an early age. Yet, as a young adult, he was able to provide for his wife and children. He was a hard-working man who progressed through a professional career and lovingly cared for his family. Though the disadvantages of his childhood certainly plagued him, Chris was known as a compassionate, affable, and warm person. Prior to the 2020 election, Chris lost his job to the pandemic, lost his father to suicide, and lost control of his substance abuse disorders – his mental health issues went untreated. Chris was drawn into online communities which came to embrace the election lie; these communities provided Chris with the impression of control over an increasingly unstable life. Now, Chris is before the Court – for having assaulted a police officer during the January 6 riot. Chris takes responsibility for his actions. However, an examination of his personal characteristics, his past conduct, and his life prospects places his conduct in context.  Chris is in need of drug treatment and mental health services. Once he receives treatment and substance abuse counseling, Chris will be able to return the community as a law-abiding, positive person. In light of the statutory factors set forth at 18 U.S.C. § 3553(a), Chris is requesting that this Court sentence him to twelve months and one day in the Bureau of Prisons, and for the Court to impose a mandatory thriteen-month inpatient substance abuse treatment program as a condition of supervised release.

//

//

**II - Procedural History**

On June 23, 2021, Mr. Willden was indicted with eight counts related to his conduct at the Capitol on January 6, 2021. ECF Dckt. #1. Mr. Willden had an out-of-district initial appearance in the Eastern District of California; he was released with pretrial conditions during the pendency of the case. *See USA v. Willden*, 1:21-mj-00067-BAM. On July 22, 2021, Mr. Willden made an initial appearance in the District of Columbia. *See* ECF Dckt. #7, 8.  On December 1, 2021, grand jury in the District of Columbia returned an eight count Superseding Indictment charging Mr. Willden with Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count One); Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) (Count Two); Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Three); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Four); Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4) (Count Five); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Six); Act of Physical Violence in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Seven); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Eight). ECF Dckt. # 18.

**III – Plea Agreement.**

On April 7, 2022, Mr. Willden pled guilty pursuant to Count Two of the Indictment – Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon in violation of 18 U.S.C. §§ 111(a). ECF Dckt. # 28. Pursuant the plea agreement, the government will dismiss the remaining charges. *Id*. Sentencing was set for August 5, 2022. Mr. Willden surrendered into custody after entering his plea. *See* ECF Dckt. # 27

In the plea agreement, the parties agreed to the following guideline computation for the violation of 18 U.S.C. § 111(a)(1): the base offense level is 14, U.S.S.G. §2A2.2(a), and six levels are added for official victim, U.S.S.G. §2C1.1, for an offense level of 20. *See* Presentence Report, ¶ 9 ('PSR'). The government will recommend a three-level reduction for acceptance of responsibility; therefore, the estimated offense level is 17. *Id.* Mr. Willden has no criminal history points, giving him a Criminal History Category of I. *Id.* Mr. Willden's Sentencing Guidelines range is between 24 months to 30 months. *Id.*

**IV - Applicable Legal Principles.**

In determining an appropriate sentence, the advisory Guidelines range is but one factor for the Court to consider. The sentencing court must give equal consideration to the statutory factors set forth at 18 U.S.C. § 3553(a), and "impose a sentence sufficient, but not greater than necessary" to accomplish the purposes of sentencing. *See United States v. Booker*, 543 U.S. 220, 245 (2005); *Kimbrough*, 552 U.S. 85. In order to achieve these goals, § 3553(a) requires the sentencing court to consider the nature of the offense, the history and characteristics of the defendant, and the need for the sentence imposed to reflect the seriousness of the offense, provide just punishment, afford adequate deterrence, protect the public, provide needed treatment, and avoid unwarranted sentencing disparities among defendants with similar records convicted of similar conduct, and provide restitution. 18 U.S.C. § 3553(a)(1)-(7). As the Supreme Court confirmed, courts are "no longer . . . tied to the sentencing range indicated in the guidelines." *Cunningham v. California*, 549 U.S. 270, 286 (2007). Rather, courts are "obliged to 'take account of that range' along with the sentencing goals Congress enumerated in the [Sentencing Reform Act]." *Id.* (quoting *Booker*, 543 U.S. at 259.) Indeed, the circumstances of this case along with Mr. Willden's personal history, exemplify why the Supreme Court restored a sentencing court's discretion "to consider every

convicted person as an Individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487 (2011) (internal quotations and citations omitted). Consideration of all these factors supports sentence a twelve-months and one day sentence, followed by a thirteen month inpatient program as a term of supervised release. Such a sentence serves the goals of sentencing as it holds Mr. Willden accountable for his conduct, deters similar conduct, and provides him the opportunity for rehabilitation. It is a sentence "sufficient, but not greater than necessary, to accomplish the sentencing goals advanced." *Kimbrough*, 552 U.S. at 111.

**V – Mr. Willden's History and Characteristics Support a Downward Variance.**

Chris grew up in "dysfunctional household" that was strife with neglect and drug use. ECF Dckt. # 35, p.2.  Chris has suffered from trauma, mental health issues, and substance abuse. Through this, he managed to build a family and start his own business. However, by the time of the 2020 presidential election, Chris had fallen prey to the misleading and corrosive propaganda that saturates our media environment and online spaces. In that context, he made the decision to travel to DC for President Trump's 'Stop the Steal' rally. In the chaotic environment fostered by those leading the mob, under the influence of the collective emotion and sense of urgency created by the mob, Chris's behavioral disinhibitions eroded, leading to his assaultive conduct. He's remorseful for his participation in this event. Once Chris is released from prison, he hopes to participate in a substance abuse treatment program so that he can overcome his addictions. A lengthy substance abuse inpatient treatment program will help Chris learn to cope with the stressors of life as he reintegrates into society. Chris has been accepted into a thirteen-month, faith-based, inpatient drug treatment program. Exhibit, G. The drug treatment program in located in central California. Once Chris has the tools to successfully manage his past, he intends on restarting his life, getting a job, and never

returning before the Court again.

      i.     *Chris Had a Dysfunctional Childhood Home.*

On July 22, 1981, Ricky Christopher Willden ('Chris') was born into childhood marked by instability. PSR, ¶ 58. Chris is the youngest of three siblings. His brother Jeremy was the oldest. He also has a sister, Kelly. When Kathy and Ricky Sr. were together, their relationship was marked by physical, emotional and verbal abuse. PSR, ¶62.  Kathy Pombo, his mother, was not yet 20 when he was born. *See* Exhibit B. Chris's father, Ricky Willden ('Ricky Sr.') was an abusive addict. PSR, ¶ 60.  Chris's mother was also using substances. *Id*.  Chris's parents were very young when they got married; Kathy was 15 years old. The couple met at a Mormon church. Because Kathy was pregnant, she and Ricky Sr. travelled to Utah to get married where the child-marriage laws allowed their union.

When Chris was born, Ricky Sr. worked as a machinist. He prevented his wife Kathy from working. She became trapped in the relationship. PSR, ¶ 60. When Chris was a toddler, Kathy raised the abuse she was suffering with senior members of their church, but her plight was dismissed. PSR, ¶ 62.  In response, she fled to San Luis Obispo with her kids and lived at a friend's home. *Id*. The friend was also a single mother. In total, there were five kids in the house; both moms continued to 'party' even though there were many kids to care for. *See, e.g*., Exhibit B, p.2 Given she was no longer with her husband, Kathy had to work to support her kids. PSR, ¶ 62. Kathy worked various jobs; she moved around from San Luis Obispo, back to Chowchilla, and then again to Morro Bay. *Id*.

Although Kathy and Ricky Sr. were separated, he still had an influence on the family. Around this time, however, Ricky Sr. was in a traumatic car accident which put him in a rehab facility for almost 2 years. The traumatic brain injury effected Ricky Sr. for the rest of his life, and

it effected the way he interacted with his kids. Exhibit B, p.3. Ricky Sr. became more irritable and had a shorter temper. *Id.*

 Kathy eventually met her second husband, Dave Rodgers, who never worked. PSR, ¶ 62. Although Mr. Rodgers was kind to the children, he was also an alcoholic. Kathy did not have stable jobs and, as a result, she and her kids frequently moved. PSR, ¶ 62. When Chris was in the fourth grade, Kathy again made the decision to move from the Central Coast back to Chowchilla with the encouragement of her parents. *Id*. In hindsight, Kathy believes moving back to Chowchilla was a bad idea; she was unable to keep her kids from negative influences while living in the Central Valley. *Id*. She stayed with Dave for nine years, but he was never employed and their relationship fell apart. *Id*. She had a series of jobs, working at Williams Brothers, Safeway/Vons and the U.S. Post Offices in Merced, Atwater and Fresno. She still had little time to watch her kids.

Living in Chowchilla was exceptionally difficult for the children. Dave Rodgers did not watch the kids – he'd frequently be travelling. Because of Kathy's work schedule the kids were often without supervision. Moreover, as a child, Chris did not have a stable place to sleep and never had a room to call his own. Food was sparse at the time. PSR, ¶ 61a. The instability in his sleeping arrangements would continue until he was a young adult. While he was in the custody of his mother, Chris had to fend for himself. They frequently lived in places that were too crowded, with mattresses on the floors. At one point, when Dave and Kathy moved into a house of their own, Chris and Jeremy lived in a garage, with a sheet hung between them for privacy. For a time, they lived in a church that was converted into a home. When Chris was fourteen years old, Dave Rodgers and his mother separated. PSR, ¶ 61. Again, Chris found himself alone, or under the influence of his older brother.

In 1991, Chris and his siblings spent a summer with their father. The summer was hectic

and at times traumatic. Ricky Sr. had anger issues. Exhibit B, p.3.  During a trip to the local pool, Chris suspected his father of abusing drugs while they were there. Exhibit F, p. 13. Chris went to find a phone number so that he could call for help but was confronted by his father. *Id*. Ricky Sr. "beat [his] head in the floor board of the van." *Id*. Ricky Sr. also made a comment that made Chris believe that Ricky Sr. may not be his biological father – a pervasive, and emotionally damaging rumor, that has clouded Chris's life. *See* Exhibit B, p.2.  Overall, Chris's experience with his father was negative. Exhibit F, p. 13.

Chris's school records paint a picture of the trajectory of his childhood. When he was an elementary school student, Chris displayed lots of promise. Although he was almost held back in Kindergarten, Chris made steady academic progress until he was close to middle school. He was again almost held back in 7th grade. However, by that time, he was routinely missing school, having poor performance in the classroom, and acting disruptive. This sort of behavior could be expected when living in an environment with drugs, alcohol, lack of care, and absentee parents.

    *ii.*    *Early Introduction to Substances.*

Chris lacked the educational and extracurricular opportunities that many have. "Chris never had a birthday party. He never had the opportunities to play sports that kids did." Exhibit B, p.2, Chris was (and still is) an excellent athlete. Rather than receive parental encouragement to pursue an active and positive lifestyle, Chris was left to himself. "By age twelve Chris was a street kid. There were never standards or restrictions, curfews, encouragement or the things children need to grow up feeling valued, loved, connected and happy." *Id*. Rather, Chris was plunged into the dark world of substance abuse at an early age.

At home, nobody would stop the kids from taking drugs, smoking cigarettes or drinking alcohol. By the age of fourteen, Chris was taking care of himself and looking to his older brother

Jeremy for guidance. His brother drifted into a crowd of folks who introduced him to drugs and a rougher 'biker' lifestyle. PSR, ¶ 62. At times, Chris hung out with his brother and eventually fell prey to the lure of drugs. *Id.* As a young teenager, Chris was using methamphetamine. His mother did not prohibit the conduct; at she times she engaged in the drug use with her sons. PSR, ¶ 60. Chris's grandmother also notes that Chris and "his siblings suffered because their mother became involved in substance abuse and was often not available to care for him" and his siblings. Exhibit B, p. 1. Kelly moved out of the house to live with her grandparents because she recognized the toxic environment that was festering. Chris began to exhibit more antisocial tendencies. He was truant more often and began to have more behavioral issues while in school. By high school, with no support and no familial encouragement, he was failing most of his classes. He failed to graduate. PSR, ¶ 78a.

Chris was a talented athlete in high school. He was not always able to do extracurricular activities though, because his family did not have the financial means. Exhibit B, p.1. Nonetheless, Chris played football for a short time. While playing football he believes he may have suffered concussions, though they were never diagnosed. PSR, ¶ 68. Injuries to his shoulder, which have plagued him for most of life, also stunted his high school sports career. *Id.*

Chris's life was rife with negative experiences from an early age. He recognized that he was living in a toxic environment when he was young. PSR, ¶ 61. At the age of 15, Chris moved out of the house in Chowchilla. Around this time, his mother gave up her parental rights over him. PSR, ¶ 61 fn.4. Chris was succumbing to a methamphetamine habit. He knew he had to change something in his life. Without many options, he made the decision to move to be with his father in Washington State. However, his father was also using drugs, and the move didn't help Chris get away from the drugs he was using as a teen. In fact, Chris's father would encourage the drug use and occasionally

they would take drugs together. His father would abuse him physically, use him to buy drugs, and eventually disown him. Exhibit F, p.13.

Chris's childhood was stressful. His family life was absent. He was exposed to heavy controlled substances at an early age. He was physically and emotionally abused. These childhood experiences stayed with him throughout his life. Adverse childhood experiences ("ACES") and chronic childhood stressors like the ones that Chris endured on a day-to-day basis can alter the brain.[1] Recent guidance from the Centers for Disease Control corroborates this:

> "A large and growing body of research indicates that toxic stress during childhood can harm the most basic levels of nervous, endocrine, and immune systems, and that such exposures can even alter the physical structure of DNA (epigenetic effects). Changes to the brain from toxic stress can affect such things as attention, impulsive behavior, decision-making, learning, emotion, and response to stress. Absent factors that can prevent or reduce toxic stress, children growing up under these conditions often struggle to learn and complete schooling. They are at increased risk of becoming involved in crime and violence, using alcohol or drugs, and engaging in other health-risk behaviors. They are susceptible to disease, illness, and mental health challenges over their lifetime. Children growing up with toxic stress may have difficulty forming healthy and stable relationships. They may also have unstable work histories as adults and struggle with finances, family, jobs, and depression throughout life—the effects of which can be passed on to their own children."[2]

Chris's childhood experiences increased the risk that he would suffer from mood disorders and substance abuse later in his life. Exhibit F, p. 12. This ultimately contributed to

---

[1] *See* Vincent J. Felitti, M.D., FACP, et al., *Relationship of Childhood Abuse and Household Dysfunction to Many of the Ladings Causes of Death in Adults: The Adverse Childhood Experiences (ACE) Study*, 14 AM. J. PREVENTIVE MED. 245 (1998), https://www.ajpmonline.org/action/showPdf?pii=S0749-3797%2898%2900017-8; *see also* Karen Hughes, et al., *The effect of multiple adverse childhood experiences on health: a systematic review and meta-analysis*, 2 THE LANCET e356 (Aug. 2017), https://pubmed.ncbi.nlm.nih.gov/29253477/ ("Physiological and biomolecular studies are increasingly establishing how childhood exposure to chronic stress leads to changes in development of nervous, endocrine, and immune systems, resulting in impaired cognitive, social, and emotional functioning and increased allostatic load (i.e., chronic physiological damage)."

[2] *Preventing Adverse Childhood Experiences (ACEs): Leveraging the Best Available Evidence*, THE CENTERS FOR DISEASE CONTROL & PREVENTION (2019), p.10. https://www.cdc.gov/violenceprevention/pdf/preventingACES.pdf

the offense conduct.

      *iii.*     *Adulthood.*

As Chris got older, though still in high school, he moved out of his father's house and was homeless. He would go from couch to couch, until he met his wife, Amanda Willden. PSR, ¶ 62. Amanda became pregnant when she was 18. PSR, ¶ 63. Chris and Amanda had their first son, Christien. They got their own apartment. Chris was employed. This appeared to begin a new chapter in his life.

However, Chris experienced two setbacks that took an emotional toll him and altered the trajectory of his life. His brother died tragically on the side of a highway while working. PSR, ¶ 59. His son was diagnosed with autism. PSR, ¶ 63. Chris and Amanda both struggled with addiction issues. Nonetheless, Chris worked hard to support his family. He took whatever jobs would pay him. He used the money to support his family and most notably, his son's therapy for autism. For several years, Chris was his son's primary caretaker. Exhibit B, p. 3-4. He assisted him through therapy and did whatever he could to make his son's life more comfortable. PSR, ¶ 63. As Chris grew older, he began to believe there was some link between vaccinations and his son's autism. Chris spent lots of time doing at-home therapies with Christien. The at-home therapy lasted years and took countless hours and thousands of dollars. Amanda and Chris came to believe, like many parents, that MMR vaccine was the cause of Christien's autism.

Over the years, Chris has had numerous injuries. His shoulder and back have caused him pain for years. When Chris was moving back to Chowchilla from Washington with his family, he fell from a moving truck and suffered a fracture to his jaw. His chronic pain has been treated with opiates. He developed a pain pull addiction. At times, Chris would take a dozen of narcotic pills per day. PSR, ¶ 74. Chris was also still using methamphetamine.

Through his meth and opiate addictions, Chris managed to maintain a good relationship with his wife and kids until recently. He was a supportive father and husband. Upon moving back to California, Chris was employed in the insurance sales industry. He had success as an insurance salesman.  In October of 2017, however, Chris overdosed on methamphetamine. In 2020, Chris's father Ricky Sr. was found with a self-inflicted gunshot wound to the chest. Soon thereafter, Chris's grandfather Lloyd also passed away. He was buried in January of 2020 in Idaho. Due to the pandemic, Chris also lost his employment, and his addictions continued to plagued him.

    iv.    *Mental Health and Substance Abuse Issues*.

When considering the appropriate sentence in this case, the Court should also take into account Chris's mental state at the time he committed the offense. Chris was evaluated by Dr. Howsepian in preparation for sentencing in this case. Dr. Howsepian's evaluation of Chris provides insight into Chris's underlying mental health disorders, his upbringing, and his conduct on January 6. *See* Exhibit F.

Chris has long suffered from addiction. As he said at his change of plea hearing, this is something that's been affecting him his whole life. Chris began using substances when he was exceedingly young – a teenager. Numerous studies found that methamphetamine impacts adolescent brain development; one study concludes that adolescent brains are more susceptible to methamphetamine-related alterations than adult brains and that methamphetamine-use-related executive dysfunction is greater in adolescent methamphetamine users than in adult users. I K Lyoo et al., *Predisposition to and effects of methamphetamine use on the adolescent brain*, 20 Molecular Psychiatry 1516 (2015). Methamphetamine abuse also induces impulsivity. Hannah W. Jones, Andy C. Dean, Kimberly A. Price & Edythe D. London (2016) *Increased self-reported impulsivity in methamphetamine users maintaining drug abstinence*, The American Journal of Drug and Alcohol

Abuse, 42:5, 500-506.   In the time leading up to the offense, Chris's substance abuse issues grew

increasingly worse. Exhibit D, p.1. After the arrest, Chris continued to have substance abuse issues.

Chris attempted to enter a treatment program while this case was pending. "However, the

Government opposed the placement due to the length delay it would cause in the [Chris's] case."

ECF Dckt. # 23, p.3. Chris continues to seek substance abuse treatment.

## VI – The Offense Conduct

Like many people, Chris got sucked into the riot and became a participant although he had

no design to do so at the outset.[3]  Notably, when Chris went to the capitol on January 6, he was not

part of the group of Proud Boys who met separately, away from the Ellipse where President Trump

was making his speech. Rather, Chris was at a booth run by a pro-Trump women's group of people

from the Central Valley. It was only once he heard of the commotion that was going on at the

Capitol that he went to investigate. He did not post any violent rhetoric on social media on the lead

up the event. He did not coordinate with any other people during the commission of his crime.

Chris was not part of the crowd of people who pressed towards the East Columbus doors of

the Capitol Building. He did not engage in any hand-to-hand combat with police officers. Chris was

not in front of the group of people. There were several people between him and the officers that he

sprayed with the chemical irritant. He acted impulsively during a climactic moment. Thereafter, he

walked away from the doors, until they were breached. Thirty minutes later he walked into the

Rotunda, walked around for a bit and then he left the Capitol. He spoke to several police officers. He

was present in the Capitol building for 18 minutes. *See* PSR, ¶ 24, 25. He was not "among the rioters

who destroyed or stole government property." ECF Dckt. # 35, p.1. Chris did not travel to DC with

the intention of harming any police officers. He was not part of a sinister plot to overthrow the

---

[3] Contrast to *United States v. Guy Reffitt*, 1:21-CR-00032-DLF, an armed militia member advocating a violent takeover of the Capitol.

government. The opportunity to attend the rally came up a few days earlier. PSR, ¶66 b. He posted a

fundraiser merely two days before the event. Chris is ashamed of his conduct. He's especially

ashamed because he's a supporter of law enforcement and was drawn to protests because he thought

police officers were being unfairly denigrated in our society.

**VII – A Twelve Month Sentence, Followed By a Mandatory Thirteen Month Inpatient Program as a Condition of Supervised Release Is a Reasonable Sentence.**

Chris's upbringing, his mental health and substance abuse issues all effected the way he

approached the Stop the Steal rally and influenced his actions on that day. Had he not suffered from

untreated mental health and substance abuse issues, Chris likely would not have made the same

choices leading up to this incident. He could have had better impulse control. Chris understands that

accountability is appropriate for his conduct. He asks the Court to examine the circumstances that

lead to his participation in this event.

Chris had a dysfunctional, unstable childhood. His childhood experiences continue to affect

him.  Chris never had stability in his life. As a result, he sees the world as unpredictable and

dangerous. Exhibit F, p.17.  Chris experienced frequent let down from father figures in his life. Now,

he's mistrustful. Chris was subject to abuse and neglect. Now, he's been diagnosed with untreated

mental health disorders. Exhibit F, p.12.  Because of his childhood, Chris has had a lifelong battle

with addiction. Chris's substance abuse increased his paranoia.

Chris also lost his employment shortly before this incident. Prior to losing his job, Chris

was steadily progressing professionally. When he was young, he worked small jobs. Eventually, he

became a life insurance salesman. And prior to the pandemic, he opened up his own insurance

agency. PSR, ¶82. However, "beginning in 2020, the business income 'evaporated' due to the impact

of the COVID-19 pandemic." *Id*. Chris was losing control of his life. Moreover, two of his family

members passed away and his drug abuse was spiraling. In that context, towards the beginning of the

17

pandemic, Chris was drawn into the divisive and anger-baiting spaces of the internet.

Prior to the pandemic, Chris was not political. Exhibit F, p. 9. However, his time on the internet during pandemic isolation increased his political consciousness. Online communities gave Chris a sense of belonging. Chris began to endorse President Trump and to follow the right-wing social media system. Chris was on Facebook—hooked into anger-baiting disinformation. Eventually, he gravitated towards Facebook groups that sought to counter political violence and vandalism in the streets. YouTube videos deepened his antagonisms. PSR, ¶ 66b. After Chris's father killed himself, his mother noticed that his demeanor changed, and Chris became more overtly political. *Id*. Like many people, Chris felt like American ideals were being attacked. *Id*. Chris wanted to do something. His political associations were regrettable. But given the history of abandonment, paranoia, anxiety and self-reliance, one can see why he drawn towards those groups. Exhibit F, p.15. After losing his father, his business, Chris was drawn to a "Brotherhood that took him by storm. Within 6 months Chris found himself on the steps of the [Capitol] standing for something that he didn't really understand." Exhibit D, p.1.

Coupled with his methamphetamine addiction, Chris soaked in the negativity he was receiving from the internet, and he became paranoid and distrustful. The restrictions imposed by COVID along with the prospect of forced vaccination made Chris see the world in an increasingly dark way. He had already made a negative association between vaccines and his son's condition; the idea that the government would impose a mandate effected his mindset.  Popular media hyped the social conflict between law abiding citizens and marauding antifascists who were victimizing the community. Chris wanted to support the police who he saw being vilified by different factions of protestors and 'do something' about the 'direction the country' was headed. He was depressed by the looting and vandalism he saw occurring in cities.

Chris, like many others, came to believe the lie that the election was stolen. The then-President was alleging, along with many others and prominent media figures that the outcome was profoundly undemocratic. Chris was concerned about the state of his country. President Trump had told Proud Boys to 'stand by.' President Trump called on people to come to Washington DC.

At the time of the offense, Chris was in the throes of his addiction. *See* Exhibit D. While present at the Capitol, Chris was under the influence of a toxic combination of substances. PSR, ¶ 62. These interacted in complicated ways, and surely effected his mindset leading up to the moment that he committed this crime. *See* Exhibit F. The "confluence of Mr. Willden's mental health disorders contributed to Mr. Willden's conduct on the day of the offense." PSR, ¶ 72a.

The crowd was incredibly chaotic. Riot control tactics that were employed, like flashbangs and tear gas, increased the antagonism between police and protestors. Pepper spray, tear gas, sirens, chanting; this all created a hyper-emotional environment. A mob mentality was fostered. "This predictable weakening of one's ability to inhibit one's actions as an individual who is part of a riotous crowd who is experiencing the intense pressures of collective emotion and a sense of urgency to act is all the more significant in Mr. Willden's case insofar as he brings to these circumstances preexisting emotional vulnerabilities." Exhibit F, p. 18. He was pepper sprayed himself. Chris ultimately took an impulsive act, while caught up in the moment. He regrets what he did and realizes how he contributed to a terrifying event for the police officers subject to the attack.  He further realizes how damaging his conduct was to the democratic ideals he considers himself a proponent of.

The variance from the Guidelines requested by Chris is not a radical departure from probation's recommendation. If the court imposes a twelve-month sentence, followed by a mandatory thirteen-month inpatient drug treatment program, Chris would be segregated from society for a 25-month period, relatively consistent with probation's recommendation. Chris needs substance abuse

treatment. He agrees with probation's RDAP recommendation. The length of Chris's sentence will determine his eligibility, however. To qualify for RDAP, one must, inter alia, have at least 24 months or more remaining to serve on their sentences. Given Chris's pre-sentence incarceration, even if the court were to impose a mid-guidelines sentence, he would not be eligible for RDAP by the time he gets to prison. Chris is "amenable to a faith-based treatment program in order to recruit his spiritual commitments into his efforts at abstinence." PSR, ¶ 72a. Federal courts have granted variances after considering how a longer sentence would impair a defendant's rehabilitation. *See Gall*, 552 U.S. at 44-45 (2007); *United States v. Collington*, 461 F.3d 805 (6th Cir. 2006) (variance upheld because it sufficiently reflected the seriousness of the offenses while allowing the possibility for defendant to reform and go on to a productive life); *United States v. Autrey*, 555 F.3d 864 (9th Cir. 2009) (court's finding that defendant would be better served by outpatient psychiatric treatment, supported reasonableness of imposing five years' probation instead of a guideline term of 41–51 months). Chris has previously attempted to maintain his sobriety. He's also expressed interest in attending rehab. He wanted to go a two-year program while he was on pretrial but was unable to attend due to circumstances related to this case. Chris has never received help for any mental health or substance abuse issues. PSR, ¶ 72. Chris has periods of abstinence, however. He hopes to take advantage of any possible drug treatment he can receive. PSR, ¶ 75

This is Chris's first criminal conviction. His lack of criminal history is frankly remarkable in light of his childhood, substance abuse and mental health issues. *See Santosky v. Kramer*, 455 U.S. 745, 789 (1982) (Rehnquist J., joined by Burger, C.J., White and O'Connor, J., dissenting) ("It requires no citation of authority to assert that children who are abused in their youth generally face extraordinary problems developing into responsible, productive citizens.") This is also Chris's first time in custody. Federal courts have granted variances after considering that the defendant has not

previously served time in prison. See *United States v. Baker*, 445 F.3d 987 (7th Cir. 2006) (affirming

non-guideline sentence, justified in part by judge's finding that prison would mean more to this

defendant than one who has been imprisoned before, which resonated with goal of "just punishment"

in Section 3553(a)(2)(A) and "adequate deterrence" in Section 3553(a)(2)(B).)

  Chris's actions at the capitol have placed a significant strain on his personal life. His infamy

has contributed to the loss of his family. His wife has filed for divorce. Because the kids live with her,

he no longer has contact with them either. He moved out of the family home and currently does not

have a job – or a home. Chris is looking forward to taking advantage of whatever rehabilitative

opportunities he can while he is incarcerated so that he can make a better life for himself and better

decisions when he's out of custody. He recognizes his substance abuse issues also have contributed to

the position he's in today. An inpatient treatment program can help Chris get back on the right path.

Chris has been accepted into Teen Challenge's thirteen-month inpatient program in Watsonville,

California. Exhibit G. The Teen Challenge program is religion-based addiction recovery program,

where Chris will be able to participate in counseling, therapy and religious activities. Chris knows

other people who have successfully completed this program. He hopes to do the same so that he can

turn his life around.

  Many January 6 cases have gone to sentencing. [4]  There are two cases which merit special

---

[4] Counsel is aware of several January 6 cases involving violations of 18 U.S.C. § 111: *United States v. Scott Fairlamb*, 1:21-CR-00120-RCL (defendant convicted of 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 111(a)(1) sentence of 41 months); *United States v. Robert Palmer*, 1:21-CR-00328-TSC (defendant convicted of 18 U.S.C. § 111(a) and (b) sentence of 63 months); *United States v. Devlyn Thompson*, 1:21-CR-00461-RCL (defendant convicted of 18 U.S.C. § 111(a) and (b) sentence of 46 months); *United States v. Nicholas Languerand*, 1:21-CR-00353, (defendant convicted of 18 U.S.C. § 111(a) and (b) sentence of 44 months); *United States v. Duke Wilson*, 1:21-CR-00345-RCL (defendant convicted of 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 111(a)(1) sentence of 51 months); *United States v. Matthew Miller*, 1:21-CR-00075 (defendant convicted of 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 111(a)(1) sentence of 33 months); United States v. Greg Rubenacker, 1:212-CR-00193 (convicted of ten counts, including 18 U.S.C. § 111(a)(1), sentence of 41 months). These cases are distinct from Mr.

consideration because of similarities to Chris. The first is *United States v. Mark Leffingwell*, 1:21-CR-00005-ABJ (defendant convicted of 18 U.S.C. § 111(a)(1) sentence of six months); the second is *United States v. Kevin Creek*, 1:21-CR-00645-DLF (defendant convicted of 18 U.S.C. § 111(a)(1) sentence of twenty-seven months). Each of these cases involve the same convictions as Chris, and both defendants had the same criminal history category. Mr. Creek assaulted two officers and engaged in hand-to-hand combat. Mr. Leffingwell also punched police officers but in apparent response to being pushed. Chris's conduct is not as aggravated as Mr. Creek's but less mitigated than Mr. Leffingwell. A sentence of twelve months is therefore consistent with other sentencing decisions, reflects the seriousness of the offense and is a just punishment. He recognizes that his conduct was antithetical to the ideals that he espoused and accepts whatever punishment the Court deems appropriate.

//

//

//

//

//

---

Willden's because they either involve additional more serious allegations or because the officers involved suffered injuries.

**VIII – Conclusion**

For the reasons set forth above, Chris respectfully requests that this Court sentence him to a term of twelve months and a day at the Bureau of Prisons, followed by a special condition of supervised release that he attend a thirteen-month inpatient program.

HEATHER E. WILLIAMS

Federal Defender
Eastern District of California

Date: 7/28/2022                                   */s/ Griffin Estes*
                                                  GRIFFIN ESTES
                                                  Assistant Federal Defender
                                                  Attorney for Defendant
                                                  RICKY WILLDEN
                                                  CA Bar # 322095
                                                  Office of the Federal Defender
                                                  2300 Tulare Street, Suite 330
                                                  Fresno, CA  93721
                                                  griffin_estes@fd.org
                                                  (559) 487-5561