# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-423-RC** |
| **RICKY C. WILLDEN,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Ricky C. Willden to thirty months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

## I.      INTRODUCTION

The defendant participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars in losses.[1]

Willden, a self-professed member of the Proud Boy organization, traveled across the country from his home in California to the District of Columbia, where he, like thousands of others, marched on the Capitol. He crossed toppled barricades and moved past overrun officers on his way

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

to the East Columbus doors of the U.S. Capitol building. By the time he arrived, hundreds of rioters had already surrounded the U.S. Capitol Police Officers guarding those doors. And as the crowd attacked, Willden raised his hand and sprayed the officers, including M.C., M.F., D.V., J.S., R.R., and R. S., with a chemical irritant.

Willden, along with the rest of the rioters in that location, eventually breached the East Columbus doors and entered the Capitol building. Security footage captured Willden walking through the lobby towards the Rotunda, where he remained for approximately 15 minutes.

Celebrating his shameful and assaultive conduct, Willden later posted to Facebook, "I think they got the message from everyone of all ages" and "FYI the cop who started this shit by mazing me and hitting my nuts playing stupid games, hope you enjoyed my special prizes."

The government recommends that the Court sentence Willden to thirty months' incarceration, which is at the top of the stipulated advisory Guidelines' range of 24-30 months. A thirty-month sentence reflects the gravity of Willden's conduct.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, Willden among them, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See*

2

*United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

As set forth in the PSR and the Statement of Offense incorporated into Willden's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Michael R. Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers.

All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* ECF No. 29, Statement of Offense ¶¶ 2-7; PSR ¶¶ 16-21.

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred police officers. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at*

4

https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol

Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous

weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement

officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers

and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol,

J. Brett Blanton, Statement before the House of Representatives Committee on House

Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-

05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect

of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S.

Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included

wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and

photography equipment, broken furniture, damaged artwork, including statues and murals, historic

lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol

Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott,

Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24,

2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-

AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The

attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7

million dollars.

### B.     Willden's Role in the January 6, 2021 Attack on the Capitol

Each rioter's actions – from the most mundane to the most violent – contributed, directly

and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

### *Approach to the Capitol*

Ricky C. Willden traveled all the way from California to the District of Columbia to participate in the January 6 attack on the Capitol. His crimes are documented through a series of open-source videos filmed outside of the building, as well as surveillance footage capturing his movements inside of the Capitol.

On January 6, 2021, Willden is captured on video standing in the crowd near the steps of the U.S. Capitol Building. In the video, Willden appears to be using a cellular telephone to record the crowd around him. On the back of the cellular phone is the distinctive writing, "I [heart] my proud boy" in yellow lettering. Willden is wearing a dark jacket, beanie cap, and gloves:



*Figure 1: Willden Standing Outside of the Capitol Building Filming the Crowd*

### *The Breach of the Rotunda Doors*

While the first breach of the Capitol occurred on the west side, the east side breach occurred not long after. Rioters pushed past barricades and pushed the Capitol Police up the steps, toward the Rotunda Doors.



*Figure 2: Police Line Being Pushed Back by Rioters*

Rioters eventually made it all the way up the steps to the doors. A group of police officers, some carrying riot shields, attempted to disperse the crowd, but the crowd was too large to be moved. The crowd, meanwhile, chanted "Stop the steal," "Whose house? Our house!" and "USA!" At around 2:24 p.m., a loud bang was heard, and a plume of smoke issued from near the door, presumably from the discharge of a smoke or tear gas grenade.[2]

At around the same time, from inside the Capitol Building, a rioter approached the Rotunda Doors and used his shoulder to force them open. An employee who was inside the building tried to stop the rioters outside from entering the building, but he was overwhelmed by other rioters and forced away from the door.

After the rioters inside forced the doors open, they pulled a police officer through the door.

---

[2] Videos depicting the melee outside the Rotunda Doors are available at projects.propublica.org/parler-capitol-videos and are sorted by time stamps. Each of these videos is tagged with a gold "near the Capitol" label. The videos are timestamped at 2:21 p.m. (the first video at this time stamp), 2:23 p.m. (there are two videos with this time stamp, and both are of the eastern Rotunda doors), and 2:25 p.m. (the first video at this time stamp).

Rioters tried to jam their own bodies into the doorframe to keep the door open and fought with officers, pushing and pulling them out of the way.

Outside of the building, rioters cheered as the doors were forced open. Willden, equipped with goggles and using his cell phone to film the events around him, jumped up and down in celebration. *See* https://youtu.be/Mkm41FMH39g (hereinafter, "Exhibit 1").



*Still Image from Exhibit 1: Willden Filming (Time Stamp 38:29 in the Video File)*



*Still Image from Exhibit 1: Willden Celebrating with Goggles Visible (Time Stamp 38:33 in the Video File)*

Moments later, rioters outside began to pour into the Capitol building. Willden pulled his goggles down over his eyes and made his way closer to the doors:



*Still Image from Exhibit 1: Willden Putting on Goggles (Time Stamp 39:14 in the Video File)*



*Still Image from Exhibit 1: Willden with Goggles (Time Stamp 39:16 in the Video File)*

9



*Still Image from Exhibit 1: Willden Moving Closer to Doors (Time Stamp 39:23 in the Video File)*

Officers succeeded in closing the doors at approximately 2:28 p.m., after one officer hurled himself through the door and turned his back to the crowd, pushing them back just enough to allow space for the doors to close.

Inside the Capitol building, officers moved three metal benches into position to block the doors. Rioters outside continued yelling, chanting, and skirmishing with officers, trying to breach the doors again. Willden, now much closer to the officers, revealed his chemical spray, previewing the assault to come:



*Still Image from Exhibit 1: Willden Holding Phone and*
*and Chemical Irritant (Time Stamp 48:18 in the Video File)*

The rioters began singing the "Star Spangled Banner." Willden joined the singing and turned his phone to record the crowd behind him:



*Still Image from Exhibit 1: Willden Holding Goggles, "I [Heart] My Proud Boy" Phone,*
*and Chemical Irritant (Time Stamp 49:17 in the Video File)*

Then, Willden attacked:



*Still Image from Exhibit 1: Willden Spraying Officers (Time Stamp 49:32 in the Video File)*

After he sprayed the officers, Willden threw the green cannister at them. Other rioters joined in, dousing the officers in chemical spray. *See* https://www.youtube.com/watch?app=desktop&v=MVullQb-Lec (hereinafter, "Exhibit 2") at 00:46 to 01:30.

Earlier in Exhibit 2, Willden is clearly depicted, holding the green cannister:



*Still Image from Exhibit 2: Willden with "I [Heart] My Proud Boy" Phone
and Green Cannister (Time Stamp 00:02 in the Video File)*

This second video angle also captures the effect of the spraying on the officers, who wiped and shielded their eyes as they defended the doors:



*Still Image from Exhibit 2: Willden Spraying (Time Stamp 00:53 in the Video File)*

As the officers shifted to protect themselves from the spray, the rioters became emboldened. After they finished singing the national anthem (which one rioter punctuated by spraying a brown liquid toward officers), rioters began another assault, grabbing at and pushing officers, yelling, "hold the fucking line," "pepper spray 'em!" "let's go!," and "break those windows!" Rioters also chanted "grab their shields" (after rioters seized one officer's shield), "whose house? Our house!" "who's your president? Trump!" and "we want Trump!" Rioters shoved officers, beat the officers with flags, and grabbed the officers' equipment:



*Still Image from Exhibit 2: Willden Spraying as Rioters Grab Police Shield (Time Stamp 01:00 in the Video File)*



*Still Image from Exhibit 2: Seconds After Willden Threw the Green Cannister (Time Stamp 01:03 in the Video File)*



*Still Image from Exhibit 2: Rioters Assaulting Officers (Time Stamp 01:14 in the Video File)*



*Still Image from Exhibit 2: Rioters Striking Officers with Flags (Time Stamp 01:21 in the Video File)*

At 2:36, rioters inside the building found the benches blocking the Rotunda Doors and pulled them away. Three police officers rushed in and blocked the doors, but the numbers of rioters inside East Foyer grew, until the group eventually overwhelmed the officers and pushed through them, opening the doors again at approximately 2:38, with the aid of flagpoles they shoved into the opening.



*Figure 3: Rioters Opening the Rotunda Doors at Approximately 2:38 p.m.*

Alarms blared.[3] One officer inside the doors recalled at least one person grabbing his helmet, causing him to choke on his chinstrap. Another recalled wondering, "how am I going to make it out of here?"

At approximately 3:02 p.m., after the vastly outnumbered police officers were forced to retreat, Capitol building security footage captured Willden entering the U.S. Capitol building through the East Columbus doors and walking towards the Rotunda:

---

[3] *See, e.g.,* https://www.youtube.com/watch?v=jBRJmnvFfo8, at 13:13.



*Figure 4: Willden Entering Through the East Columbus/Rotunda Doors*

A different view of Capitol Security footage captured Willden walking through the lobby during the same time frame:



*Figure 5: Rotunda Lobby East Stairs View*

Additional Capitol building security footage captured Willden walking around inside of the Rotunda while it was filled with fellow rioters:



*Figure 6: Rotunda*



*Figure 7: Rotunda (Zoomed In)*

19

A few minutes after 3:00 p.m., a detachment of Metropolitan Police Department officers arrived in the Rotunda, from the west side, and began to take control of the Rotunda, forcing rioters to the east side and eventually out. Willden would have seen this. Willden eventually reentered the lobby from the Rotunda at approximately 3:17 p.m. and exited the U.S. Capitol building at approximately 3:20 p.m.:



*Figure 8: Willden Before He Exited Building*

### *Defendant's Statements*

Willden later posted to Facebook, "I think they got the message from everyone of all ages" and "FYI the cop who started this shit by mazing me and hitting my nuts playing stupid games, hope you enjoyed my special prizes."[4]:

---

[4] The Facebook post was provided to the FBI on or about January 7, 2021. The exact date and time stamp of the post is unknown.



*Figure 9: Willden Facebook Comments*

### Destruction of Evidence

From the videos referenced above, it is clear that Willden used his phone to film the events

unfolding around him. However, the government has been unable to locate any videos from

Willden's phone, which was seized pursuant to a search warrant. Additionally, a search warrant

obtained for Willden's Facebook account revealed that the post referenced above was no longer

available. The absence of the videos and Facebook posts is strong circumstantial evidence that

Willden deleted them in an effort to avoid detection for his crimes on January 6.

*Injuries*

The officers guarding the East Columbus doors were sprayed multiple times. At least six U.S. Capitol Police Officers, M.C., M.F., D.V., J.S., R.R., and R. S., have been identified as guarding those doors when Willden set out to assault them with his "special prizes." Although the assaulted officers did not report any lasting injuries as a result of being sprayed, as is clear in Exhibit 2, Willden's assault on the officers guarding the East Columbus doors help facilitate the eventual breach of those doors and aided those rioters who did succeed in injuring officers and destroying property. *See* Section II(A) ("Injuries and Property Damage Caused by the January 6, 2021 Attach") *supra.* Willden's violent conduct served to incite and embolden other violent rioters around him.

## III.   THE CHARGES AND PLEA AGREEMENT

On December 1, 2021, a federal grand jury returned a superseding indictment charging Willden with Civil Disorder in violation of 18 U.S.C. § 231(a)(3), Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1), Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. §§ 1752(a)(1), Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2), Engaging in Physical Violence in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(4), Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D), Act of Physical Violence in the Capitol Grounds or Buildings in violation of 40 U.S.C. § 5104(e)(2)(F), and Parading Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G).

On April 7, 2022, pursuant to a plea agreement, ECF No. 28, Willden pled guilty to Count Two, Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1).

He has been detained since that date.

## IV.    STATUTORY PENALTIES

Willden now faces sentencing on Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1). As noted by the plea agreement and the U.S. Probation Office, Willden faces up to 8 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The Guidelines calculation in the PSR mirrors that in the plea agreement. That Guidelines analysis is as follows:

Count Two: 18 U.S.C. § 111(a)(1)

| | | | |
|---|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | | 14 |
| U.S.S.G. § 3A1.2(a) and (b) | Official Victim | | |
| | | | +6 |
| U.S.S.G. § 3E1.1 (a) and (b) | | | -3 |
| | | **Total** | **17** |

*See also* Plea Agreement at ¶¶ 5(A).

23

The U.S. Probation Office calculated Willden's criminal history as category I, which is not disputed. PSR ¶ 44. Willden has sustained three arrests resulting in criminal charges for violent conduct that did not result in convictions and has a pending charge for felony assault of a spouse with a deadly weapon. PSR ¶¶ 44-48, 49, 51, 55. Accordingly, based on the government's calculation of Willden's total adjusted offense level, after acceptance of responsibility, at 17, Willden's Guidelines imprisonment range is 24-30 months' imprisonment. Willden's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In addition to the Sentencing Guidelines, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each

24

person who entered the Capitol and assaulted police officers on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed extensive fighting with law enforcement.

When looking at Willden's individual conduct, this Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of Willden's criminal conduct weigh heavily towards a significant term of incarceration. Willden arrived at the Capitol building armed with goggles and a chemical irritant. His conduct was premeditated. When he saw the officers struggling with other rioters outside the Columbus doors of the Capitol and the eventual first breach of those doors, Willden cheered. Then, he maneuvered to the front of the crowd of rioters and fired his own chemical irritant at highly vulnerable uniformed police officers. Willden's assault on the officers

guarding the East Columbus doors helped facilitate the eventual second breach of those doors. After the riot, Willden celebrated his criminal conduct and that of his fellow rioters, showing no contrition in his social media post. The seriousness of this offense demands a lengthy sentence of imprisonment.

**B.      The History and Characteristics of the Defendant**

Willden lacks any scorable criminal history, which weighs in favor of a less severe Sentence. PSR ¶ 44. As indicated in the PSR, Willden has a history of consuming alcohol, as well as abusing cocaine, methamphetamines, opiates, barbiturates, and hallucinogenic substances. PSR ¶ 74. While Willden maintained periods of sobriety, it is clear that he has relapsed. Indeed, while on release in this case, Willden "stalled in providing a urine sample on seven occasions between July of 2021, and February 25, 2022; failed to test on seven occasions between July of 2021, and February 25, 2022; admitted to using methamphetamines on three occasions between November of 2021 and February of 2022; and admitted to using marijuana in February of 2022." PSR ¶ 76.

The government is not unsympathetic to the difficulties addiction presents, nor to Willden's family history, *see* PSR ¶ 57-62, but nothing suggests that those circumstances accounted for any of his conduct on January 6. Though Willden has no significant criminal convictions, his methamphetamines use, in combination with his willingness to travel across the country in a premedicated effort to assault officers and storm the U.S. Capitol Building, weighs in favor of a lengthy period of incarceration.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6

26

showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[5] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Willden's criminal conduct, assaulting officers and illegally entering the Capitol Building, is the epitome of disrespect for the law. When Willden entered the Columbus doors after assaulting the officers guarding those doors, it was abundantly clear to him that lawmakers, and the law enforcement officers who tried to protect them, were under siege. Police officers were overwhelmed, outnumbered, and in some cases, in serious danger. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.     The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving

---

[5] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated by many rioters to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also

---

[6] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

weighs heavily in favor of a lengthy term of incarceration. First, although Willden has a criminal history category of I, his abuse of methamphetamines, in combination with his willingness to travel to Washington, D.C. and spray officers with a chemical irritant shows a clear pattern of someone unwilling or unable to curb his behavior. *See* Section VI(B) *supra.* Second, although Willden has accepted responsibility and pled guilty in this case, his social media post immediately following the events of January 6 reveal a lack of remorse. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). Willden's sentence must be sufficient to provide specific deterrence from committing future crimes of violence, particularly in light of his violent conduct.

E.     **The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards."

*Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged hundreds of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

## F.    Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing

disparities—the crimes that the defendant and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 111 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

As of the date of this sentencing memorandum, two felony Capitol Riot defendants have been sentenced for spraying officers in violation of 18 U.S.C. § 111(a)(1), *Mattice* and *Mault*.

In *United States v. Cody Mattice*, 21-cr-657 (BAH), Mattice's pre-riot text message conversations with his codefendant, James Phillip Mault, reveal that they anticipated and planned for violence on January 6. During the riot, Mattice recorded Mault as Mault encouraged police officers to stand aside and allow the rioters to invade the Capitol Building while it was still occupied by Members of Congress. When the vastly outnumbered officers refused to give way, Mattice pulled down a section of bike rack fencing separating the officers from the crowd. Then Mattice and Mault led the mob that penetrated the police line in the West Plaza, forcing officers to retreat to the Lower West Terrace. Later, Mattice "body-surfed" over other rioters to reach the mouth of the Lower West Terrace tunnel and used a chemical spray against the police officers who refused to yield to the mob. For the violation of 18 U.S.C. § 111(a)(1), the government recommended a sentence of 44 months' incarceration, near the top of the advisory Guidelines' range of 37-46 months. The Court sentenced Mattice to 44 months' incarceration.

In *United States v. James Phillip Mault*, 21-cr-675 (BAH), Mault encouraged police officers to stand aside and allow the rioters to violently attack Members of Congress. When the vastly outnumbered officers refused to give way, he led the mob that penetrated the police line in the West Plaza, forcing officers to retreat to the Lower West Terrace. Later, he made his way to the mouth of the Lower West Terrace tunnel and, like his codefendant Mattice, used chemical

spray against the police officers who refused to yield to Mault and his confederates. Mault then obtained another canister of pepper spray that he gave to another rioter who used it to attack officers in the tunnel. For the violation of 18 U.S.C. § 111(a)(1), the government recommended a sentence of 44 months' incarceration, near the top of the advisory Guidelines' range of 37-46 months. The Court sentenced Mault to 44 months' incarceration.

Two other felony Capitol Riot defendants have been sentenced for punching or kicking an officer in violation of 18 U.S.C. § 111(a) (without a conviction of another offense), *Creek* and *Leffingwell*. In one of those two cases, the Court sentenced the defendant within the Guideline range.

In *United States v. Douglas Creek*, 21-cr-645 (DLF), Creek shoved one police officer back several feet before striking that officer on the face shield portion of helmet and pushing a second police officer down, then kicking him. There was no evidence of Creek's preparation for violence, and he neither used a weapon nor caused injury. For the violation of 18 U.S.C. § 111(a)(1), the government recommended a sentence of 27 months' incarceration, the middle of the advisory Guidelines' range of 24-30 months. The Court sentenced Creek to 27 months' incarceration.

In *United States v. Mark Leffingwell*, 21-cr-5 (ABJ), Leffingwell positioned himself at the front of a line of rioters and shouted at police officers. When officers tried to repel the crowd, Leffingwell punched two Capitol Police Officers. Leffingwell suffered from certain medical conditions, particularly some neurological conditions that were exacerbated by an attack while he was serving with the Army National Guard. Leffingwell's other mitigating factor was that his conviction might cause him to lose his military pension. Finally, and perhaps most uniquely, Leffingwell was arrested on January 6 and sought out and apologized to his officer victims within hours of the offense. For the violation of 18 U.S.C. § 111(a)(1), the government requested a

sentence of 27 months' incarceration, the mid-point of his Guideline range, and the Court sentenced Leffingwell 6 months' incarceration.

Finally, three additional defendants have been sentenced for using objects to strike officers and were convicted of violating 18 U.S.C. § 111(a)(1) and (b), *Palmer*, *Languerand*, and *Thompson*. In all but one of those cases, the Court sentenced the defendant within the Guideline range.

In *United States v. Robert Palmer*, 21-cr-328 (TSC), Palmer repeatedly assaulted police with a wooden plank and then sprayed officers with a fire extinguisher, which he later threw at them, while on the Lower West Terrace of the Capitol. Palmer's conduct after January 6 disqualified him from the reduction for acceptance of responsibility under § 3E1.1. For the violation of 18 U.S.C. § 111(a)(1) and (b), the government requested a sentence of 63 months' imprisonment, at the bottom of the Guidelines that included no benefit for acceptance of responsibility, which the Court imposed.

In *United States v. Nicholas Languerand*, 21-cr-353 (JDB), Languerand pled guilty to violating 18 U.S.C. § 111(a)(1) and (b). He observed violence at the Capitol for two hours before joining in with other rioters to assault police officers on the Lower West Terrace. Languerand threw sticks and a traffic bollard at police officers and eventually used a riot shield against the officers. For the violation of 18 U.S.C. § 111(a)(1) and (b), the government requested a sentence of 51 months' imprisonment, at the midpoint of the defendant's guideline range. The Court imposed a sentenced of 44 months' imprisonment, two months below the bottom the Guidelines, noting the defendant's acknowledgement that his violent conduct on January 6 was wrong and his unusually difficult childhood marked by, among several notable traumas, his father's imprisonment for setting the trailer Languerand lived in with his mother on fire.

In *United States v. Devlyn Thompson*, 21-cr-461 (RCL), Thompson assaulted an officer with a police baton while on the Lower West Terrace, threw a large box speaker at a police line, and stayed in the area of some of the most vicious assaults for multiple hours. As a major mitigating factor, Thompson independently contacted law enforcement and agreed to plead guilty prior to his arrest. For the violation of 18 U.S.C. § 111(a)(1) and (b), the government requested a sentence of 48 months' imprisonment, near the bottom of the defendant's Guideline range. The Court imposed a sentence of 46 months' imprisonment, at the bottom of the Guidelines.

In the codefendant cases of Cody Mattice and James Mault, the defendants, like Willden, sprayed police officers with a chemical irritant, enabling other rioters who were attempting to violently breach the Capitol. In each of those cases, the defendants pled guilty to a violation of 18 U.S.C. § 111(a)(1) and were sentenced within the Guideline range, which was higher in those cases than in the instant case due to an offense level that included four points for the use of a dangerous weapon.[7]

Here, unlike Mault and Mattice, Willden was not charged under 18 U.S.C. § 111(b), which carries a maximum sentence of twenty years when a defendant assaults federal officers using a deadly or dangerous weapon, because the government could not identify the chemical irritant Willden deployed against the officers and determine its dangerousness. Willden was therefore able to plead to the less serious offense of § 111(a), which carries a maximum sentence of eight years. Thus, Willden has already received the benefit of a lower Guideline range than his criminal conduct merited. And although it remains unclear exactly what he sprayed on officers, Willden has admitted under oath, that, like *Mault* and *Mattice*, he armed himself with a chemical irritant,

---

[7] The government was able to identify the chemical irritant in the Mault and Mattice case as OC spray, which has been consistently charged as a dangerous weapon as utilized on January 6.

which he sprayed on officers as they were attempting to prevent the mob's entry into the Capitol building.

Furthermore, while Willden's mitigating factors are similar to those in *Languerand* in that he suffered a tumultuous childhood and struggles with a medical condition (drug addiction), unlike *Languerand*, Willden has exhibited little remorse for his actions (as evidenced by his Facebook post). Instead, like *Mault* and *Mattice*, Willden's assault on the police was premeditated. He brought goggles and a can of chemical irritant to the Capitol on January 6. Accordingly, a sentence that adopts the government's recommendation of 30 months' incarceration and 36 months' probation would not constitute an unwarranted sentencing disparity.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).

Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA.   *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing

that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*). Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[8] *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; § 3663(b); § 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[9] *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by

---

[8] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[9] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513.

nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.

The officer victims in this case did not suffer bodily injury as a result of Willden's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Willden must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Willden played in the riot on January 6.[10]  Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States

---

[10] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Willden's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 141.

## VIII.   FINE

Willden's convictions under § 111 subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

Here, there is no evidence that Willden was able to "capitalize" on his participation in the Capitol breach. Indeed, at the time the defendant was remanded to the custody of the U.S. Marshal service, he was unemployed and experiencing homelessness. Therefore, the government is not requesting a fine.

**IX.     CONCLUSION**

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of thirty months, which is the top of the guideline range as calculated by the government and as agreed upon by the parties in the plea agreement, restitution of $2,000, a fine, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar Number 481052

By:     */s/ Angela N. Buckner*
Angela N. Buckner
DC Bar #1022880
Assistant United States Attorney
United States Attorney's Office
601 D Street, N.W.
Washington, DC 20530
Phone: (202) 252-2656