**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| United States of America, | ) | Criminal Action |
| | ) | No. 1:21-cr-00423-RC-1 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Sentencing** (via Zoom) |
| | ) | |
| Ricky C. Willden, | ) | Washington, D.C. |
| | ) | **August 5, 2022** |
| Defendant. | ) | Time:  2:00 p.m. |

_____

**Transcript of Sentencing** (via Zoom)
**Held Before**
**The Honorable Rudolph Contreras** (via Zoom)
**United States District Judge**

_____

A P P E A R A N C E S

For the Government:        **Angela N. Buckner**
(via Zoom)                 UNITED STATES ATTORNEY'S OFFICE
                           FOR THE DISTRICT OF COLUMBIA
                           601 D Street, Northwest
                           Washington, D.C. 20579

For the Defendant:         **Griffin Estes**
(via Zoom)                 OFFICE OF THE FEDERAL DEFENDER
                           2300 Tulare Street, Suite 330
                           Fresno, California 93721

Also Present (via Zoom):
                           Kelly Kraemer Soares, Probation Officer
_____

Stenographic Official Court Reporter:
(via Zoom)                 Nancy J. Meyer
                           Registered Diplomate Reporter
                           Certified Realtime Reporter
                           333 Constitution Avenue, Northwest
                           Washington, D.C. 20001
                           202-354-3118

1                    P R O C E E D I N G S

2              (REPORTER'S NOTE:  This hearing was held during the
   COVID-19 pandemic restrictions and is subject to the
3  limitations of technology associated with the use of
   technology, including but not limited to telephone and video
4  signal interference, static, signal interruptions, and other
   restrictions and limitations associated with remote court
5  reporting via telephone, speakerphone, and/or
   videoconferencing.)

6

7              THE COURTROOM DEPUTY:  Judge, this is Criminal Action

8  21-423, United States v. Ricky Willden.  For the United States,

9  I have Angela Buckner.  For Ricky Willden, I have Griffin

10 Estes.  Our probation officer today is Kelly Kraemer Soares,

11 and our court reporter today is Nancy Meyer.

12         All parties are present.

13              THE COURT:  Good afternoon, everybody.

14         So let's start with the CARES Act.  I hold a short

15 colloquy when it's a formal proceeding, such as a sentencing.

16 So the Chief Judge in this district has authorized the use of

17 videoconferencing for sentencings because they cannot be

18 conducted in person without seriously jeopardizing public

19 health and safety.  We're prepared to proceed today by

20 videoconferencing for this hearing.

21         Do the parties believe that proceeding today via

22 videoconference rather than waiting until a hearing can be

23 safely held in person is in the interests of justice?

24         Mr. Estes?

25              MR. ESTES:  Yes.

```
 1              THE COURT:  Just let's put together a short record as

 2    to why it's beneficial to the interests of justice that we

 3    proceed today by video rather than waiting until heaven knows

 4    when COVID can subside and we can hold this in person.

 5              MR. ESTES:  Well, it would require me to travel

 6    from --

 7              THE COURT REPORTER:  Can I ask -- hold on just a

 8    minute, Mr. Estes.

 9         Mr. Willden, can you mute your audio until you wish to

10    speak?

11              THE DEFENDANT:  Yes, ma'am.

12              THE COURT REPORTER:  If you can start over again.

13              MR. ESTES:  So Judge Contreras asked me to make a

14    record as to why this is in the interests of justice.  And,

15    fundamentally, it's to, you know, prevent the spread of COVID,

16    which is a deadly disease.  And if the proceeding were to be

17    held in person, I would have to travel across the country out

18    of Fresno.  That would expose me to other people.  I could,

19    potentially, be an infector.  Mr. Willden, as well, could --

20    you know, would have to travel from his place of incarceration

21    to the courthouse; also can contribute to, you know, the

22    disease being passed around.  So I do think it's in the

23    interests of justice.

24              THE COURT:  And to state the obvious, Mr. Willden is

25    currently in custody; so deferring the hearing will prejudice
```

```
 1      him in that respect as well.

 2              All right.  Ms. Buckner, do you have a contrary view?

 3              MS. BUCKNER:  No, Your Honor.  I think -- especially

 4      considering Mr. Willden is detained, I think it makes sense and

 5      is in the interests of justice to -- to move this hearing

 6      forward.  And I say that both with the status being detained

 7      and also with the potential sentence he's facing.  I don't

 8      think it makes much sense given his range to delay this.

 9              THE COURT:  I agree with that.

10          So, Mr. Willden, if you can unmute yourself for just a

11      moment.  Do you agree, after having consulted with your

12      counsel, to participate in today's sentencing hearing using

13      videoconferencing rather than being physically present in the

14      courtroom?  It looks like he froze.

15              THE COURTROOM DEPUTY:  Mr. Willden?

16              THE COURT:  Did you hear my question, Mr. Willden?

17              THE DEFENDANT:  No.  It keeps freezing up.  She's

18      trying to help me right now.  It's -- I keep getting cut off,

19      but --

20              THE CORRECTIONAL OFFICER:  I'm going to switch out

21      the equipment for him.  It keeps shutting off on him.  I'm so

22      sorry.

23              THE COURT:  No problem.

24              THE DEFENDANT:  I didn't -- I literally missed all of

25      what was said.
```

1          THE CORRECTIONAL OFFICER:  I'm going to log him out

2     real quick and log him into another device.

3          THE COURT:  Okay.  Sounds good.  Thank you.

4        So off the record.

5          (Off the record.)

6          THE COURTROOM DEPUTY:  Mr. Willden is coming back in.

7          THE COURT:  All right.  Mr. Willden, the question I

8     asked you was:  Do you agree, after having consulted with your

9     counsel, to participate in today's sentencing hearing --

10         THE DEFENDANT:  Yes.

11         THE COURT:  -- via videoconference rather than being

12    physically present in the courtroom?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  And now that the equipment has been

15    switched out to one that seems to be functioning better, are

16    you comfortable with that equipment available to you and your

17    ability to consult with your attorney, if necessary?

18         THE DEFENDANT:  Yes, Your Honor.

19         THE COURT:  Okay.  So this Zoom technology we're

20    using --

21         THE DEFENDANT:  Yes.

22         THE COURT:  This Zoom technology that we're using has

23    an ability for us to put you --

24         THE DEFENDANT:  I don't know if you can hear me, but

25    you're silenced again.

1        THE COURT:  Okay.  I can hear you and see you.  So

2    I'll start that again.

3        So the Zoom technology we're using has an ability for us

4    to put you and your attorney in a separate breakout room so

5    that you can have a private conversation if you want to have

6    that.  So if at any point you want to have that private

7    conversation with your counsel during the sentencing, by all

8    means, just ask and we'll do that, and you'll be able to have

9    that sort of private communication with him.  Do you understand

10    that?

11        THE DEFENDANT:  Yes, Your Honor.

12        THE COURT:  Okay.  So the Court finds that the use of

13    the VTC is necessary because it is not practical to appear in

14    person and proceeding by VTC today is justified because the

15    interests of justice will be harmed without a prompt hearing,

16    and the defendant, after consulting with his counsel, has

17    consented to proceeding in this fashion.

18        Defendant Mr. Willden and Defense Counsel, have you

19    reviewed the presentence report as revised following the

20    defense and the government's submissions?

21        MR. ESTES:  I have.

22        THE COURT:  Any additional objections?

23        MR. ESTES:  Nothing else, other than what I already

24    stated.

25        THE COURT:  Okay.  Anything from the government?

1          MS. BUCKNER:  Not from the government, Your Honor.

2          THE COURT:  Under Federal Rule of Criminal Procedure

3   32(i)(3)(A), the Court will accept the presentence report as

4   its findings of fact on issues not in dispute.

5          This case falls within the Sentencing Reform Act of 1984

6   under which Congress created the United States Sentencing

7   Commission, which has issued detailed guidelines for judges

8   such as myself to consider in determining the sentence in a

9   criminal case like this.  The commission has set sentencing

10  ranges for specific offenses, and those ranges are contained in

11  the guidelines manual.

12         However, in light of the Supreme Court's decision in

13  *Booker*, the guidelines are not mandatory.  They are advisory

14  but must be consulted by the Court in determining the

15  appropriate sentence in a case.  Therefore, I will assess and

16  determine the proper sentence in this case by reference to and

17  in consideration of the sentencing guidelines in the first

18  instance, but the guidelines will be treated as advisory, not

19  mandatory, and there is no presumption that the guideline

20  sentence is the correct sentence.  The guidelines will be

21  considered, along with all the other relevant factors, under

22  the sentencing statute.

23         Defendant has pleaded guilty to Count 2 of the

24  indictment -- or superseding indictment for the charge of

25  assaulting, resisting, or impeding certain officers in

1    violation of 18 U.S.C. § 111(a)(1).

2         As reflected in the presentence report, using the

3    *2021 Guidelines Manual*, the base offense level is 14.  There

4    are no special offense characteristics.  There's a

5    victim-related adjustment of plus 6, and the -- resulting in an

6    adjusted offense level of 20.  There's a 3-level decrease for

7    acceptance of responsibility, 2 levels for clear demonstration

8    of acceptance of responsibility, and an additional 1 level for

9    assistance in investigation by timely provision of information

10   concerning defendant's involvement and by timely notification

11   of intent to enter a guilty plea.  That results in a total

12   offense level of 17.

13        The defendant has no criminal history resulting in

14   points, which results in a criminal history category of I.  The

15   guidelines range for imprisonment based on a total offense

16   level of 17 and a criminal history category of I is 24 to

17   30 months.

18        Mr. Estes, any objections to those calculations?

19             MR. ESTES:  No.

20             THE COURT:  Ms. Buckner?

21             MS. BUCKNER:  No, Your Honor.

22             THE COURT:  So, as I've said, under the law,

23   following the Supreme Court's decision in *Booker*, the

24   guidelines are advisory in this case but will be considered

25   fully by the Court in determining the proper sentence, along

1    with all the other factors under the sentencing statute.

2         Would the government like to address the Court regarding

3    sentencing?

4         MS. BUCKNER:  Yes, Your Honor.  And I want to start

5    out by asking Your Honor whether Your Honor had a chance to

6    view the exhibits, 1 and 2, the two YouTube links that were

7    provided in the government's sentencing memo?

8         THE COURT:  I did not.

9         MS. BUCKNER:  Okay.

10        THE COURT:  I'm not sure I even noticed those were

11   there.  So if you want to split the screen and show them, I'm

12   happy to watch them now.

13        MS. BUCKNER:  I just have a couple of shorter clips.

14   I think that the images in the still screenshots that are in

15   the government's sentencing memo, more or less, capture the

16   defendant's conduct.  So here I just want to show two short

17   clips about a minute each.  I'll start with Government's

18   Exhibit 1.  If the Court will just give me one moment.

19        Can the Court see the screen?

20        THE COURT:  I can.  It's not moving, but I can see

21   the image.

22        MS. BUCKNER:  Okay.  So for the record, this is

23   Government's Exhibit 1.  I'm starting at 1:38 and 17 seconds in

24   the actual video file.  The Court can see, of course, in the

25   lower right-hand corner that it's at 2:24.  This is shortly

1    before the first breach of the east Columbus doors.  What the

2    Court will see is the crowd is cheering, and right in the

3    forefront of this video, the Court will see Mr. Willden jumping

4    up and down and celebrating.  He should be clearly identified

5    because he's got goggles on his head.  And I'll hit play now at

6    38:17.

7              (An audio-visual recording was played.)

8              MS. BUCKNER:  I'm hitting pause at 38:30.  There's an

9    individual in the forefront of the video -- excuse me --

10   forefront of this file.  You can see his phone in his left hand

11   filming the events around him.  That is Mr. Willden.  And I'm

12   circling him now with my cursor.

13             THE COURT:  With the black gloves and the black

14   sleeve?

15             MS. BUCKNER:  Yes, Your Honor.

16             (An audio-visual recording was played.)

17             MS. BUCKNER:  And I am stopping this video at

18   39 minutes and 21 seconds.  What the Court saw there toward the

19   end, after Mr. Willden is jumping up and down and celebrating,

20   is that he continues to film the crowd around him, and then he

21   pulls his goggles down into his eyes and starts making his way

22   toward the east Columbus doors.

23             I'm now going to pull up about a minute of Government's

24   Exhibit 2.

25             THE COURT:  Before you go on, let me ask you a pretty

1    simple question.  Obviously, the government has brought a

2    number of cases against other members of the Proud Boys, and

3    the defendant has consistently said that he was there by

4    himself.  Are any of the -- to your knowledge, to the

5    government's knowledge, are any of those folks around him also

6    members of Proud Boys?

7            MS. BUCKNER:  To the government's knowledge, yes.

8    There are a couple of other individuals in close proximity to

9    Mr. Willden who have been identified as Proud Boys.

10           At this point, the government's evidence can't say

11   definitively that Mr. Willden was -- you know, traveled to the

12   Capitol with those individuals or was speaking with those

13   individuals or coordinating with them before he sprayed the

14   officers in front of that door.

15           THE COURT:  Okay.  That's helpful.  Thank you.

16           MS. BUCKNER:  And so I'm now going to pull up

17   Government's Exhibit 2 into the screen.  So I've pulled up

18   Government's Exhibit 2.  In the video file, we're at 1 minute.

19   And, Your Honor, I'm going to circle with my cursor a hand

20   holding a green can right here in the left-hand side.  Can

21   Your Honor see what I'm circling?

22           THE COURT:  Yep, I can.

23           MS. BUCKNER:  So what Your Honor is about to see is

24   that that is Mr. Willden's hand.  He is spraying the officers

25   who were bracing and reacting to his spray and the spray of

1    others that are standing around him.  And as they react and

2    shield their eyes, their defenses are down; essentially

3    allowing the crowd to assault them, pull their shields and gear

4    away from them.  Eventually, many of the officers have to get

5    out of that area, which leaves only a couple of officers in

6    front of the east Columbus doors and eventually leads to the

7    second breach of those doors.

8                    (An audio-visual recording was played.)

9              MS. BUCKNER:  And I stopped Government's Exhibit 2 at

10   1 minute and 49 seconds.  I'm going to stop sharing the screen

11   now.

12             THE COURT:  Okay.  And you indicated that both of

13   those clips are publicly available, and they're cited in the

14   government's sentencing memo?

15             MS. BUCKNER:  That's correct, Your Honor.  There's --

16   there should be a footnote.  I apologize for not putting it out

17   to the clerk when I thought of this ahead of time, but there's

18   a link for each one below.  I will tell Your Honor that the

19   clips I just showed you, I think, are the most instructive for

20   the Court.

21             THE COURT:  Okay.  No, I understand that.  I just --

22   we often get requests from the press to release the video

23   evidence, but I just wanted to make the record clear that those

24   are already available on the internet, if the press is so

25   interested.

1          MS. BUCKNER:  They are, Your Honor.

2          And so now having shown those two videos to the Court, I

3     think I just want to speak briefly to Mr. Williams -- Mr. --

4     excuse me -- Mr. Willden's conduct in particular.  I know the

5     Court has heard many times, sort of, the overview of what

6     happened on that day and January 6th and the Capitol riots.

7          And I sort of want to get to the point of what the

8     government is asking for and why.  And so I want to turn now to

9     the factors under 18 U.S.C. 3553, starting with the nature and

10    circumstance of the offense.

11          I think looking at the videos that Your Honor just saw,

12    along with the exhibits in the government's sentencing

13    memorandum, when Mr. Willden arrived at the Capitol Building,

14    you know, gates were being pulled down, officers were being

15    assaulted.  They were pushed to the ground, punched, sprayed,

16    as Your Honor can see in the video.

17          When Mr. Willden walked up to the east Columbus doors,

18    which eventually led to the Rotunda where he -- he wound up, he

19    walked up very intentionally.  He wasn't swept into the crowd.

20    No one pushed him into that area.  In fact, originally he was

21    at the back of the crowd jumping up and down and celebrating

22    after the doors were first breached around 2:24, before pulling

23    goggles over his eyes and making his way toward the door for

24    the second breach, which happened approximately ten minutes --

25    a little bit more than ten minutes later.

1          So, as I said, as the rioters breached the doors the

2     first time, he celebrated and he filmed the chaos around him.

3     He moved closer to the doors that were guarded by officers who

4     were under attack, and he raised a canister of a chemical

5     irritant, and he showed it off to the crowd around him.  He

6     turned in a circle, and then he turned and sprayed those

7     Capitol officers, in close proximity to those Capitol Police

8     officers, and that action directly led to the second breach of

9     those doors.

10          Mr. Willden may not have immediately entered the

11     building as those doors were breached a second time, but

12     there's no question that his actions contributed to that second

13     breach, along with the several other individuals Your Honor

14     just saw spraying -- spraying those officers.  And you can see

15     the officers reacting to being sprayed.  And you can see the

16     effect that -- them trying to both protect themselves and the

17     door has -- on the security in that area.  Many of them aren't

18     able to both defend the door and defend themselves, which

19     eventually leads to the crowd being able to push through.

20          So I think when looking at the exhibits --

21          THE COURT:  Let me ask you a question, Ms. Buckner.

22     Does the government know when Mr. Willden first got ahold of

23     the goggles and -- and the spray?  Did he bring them from

24     California, or did he acquire them at some point in the --

25     during -- on January 6th or at some other interval?

1    MS. BUCKNER:  We can tell, Your Honor, that there are

2    several pictures from -- from earlier in that area of the

3    Capitol where you can see Mr. Willden has goggles.  These are

4    some of the first images where we can see that he has a

5    chemical irritant.

6         One of the reasons why the government didn't pursue an

7    enhancement based on dangerous weapon is because we weren't

8    able to state definitely, based on our evidence, whether he

9    brought the spray from home or whether he obtained it from,

10   perhaps, an individual he met there or stood next to in the

11   crowd.

12        THE COURT:  Okay.  Thank you.

13        MS. BUCKNER:  And I think when looking at the

14   exhibits, Your Honor -- I think it's very clear that

15   Mr. Willden is collected.  He's intentional.  He's not reacting

16   or getting swept up by the moment, by this violent crowd.  He's

17   not out of control.  He brought goggles and at some point

18   either brought or obtained this canister, and he made those

19   decisions ahead of time.  He didn't make those decisions on a

20   whim.  He had time to think about it.

21        And so I don't think that this is a case where

22   Mr. Willden was blindly following anyone, and I think it's

23   important to point out that even after the chaos at the doors,

24   after he contributed to the officers who were impaired and had

25   to evacuate from that area, Mr. Willden still walked into the

1    building.  He wasn't swept up by the crowd or pushed in.  He

2    walked into the building after spraying those officers.

3           And so I think looking at the nature and circumstances

4    of the offense here, his conduct in its totality does lead the

5    government to ask for the top of the guidelines.  I think

6    that's in combination with the fact that, as Your Honor just

7    saw in the videos, he's clearly filming what's going on around

8    him.  Yet by the time the government was able to obtain a

9    search warrant for his phone and identify Mr. Willden, there

10   was no helpful evidence on his phone or on his Facebook

11   account.

12          And so I think that those are important indicia of why

13   the government in aggregate thinks that a -- a sentence at the

14   top of the guidelines is appropriate.

15               THE COURT:  So what --

16               MS. BUCKNER:  I know --

17               THE COURT:  Let me ask a couple questions.  One is

18   what should I make of Mr. Estes's argument that, essentially,

19   Mr. Willden was a drug-addled master in that time period?

20               MS. BUCKNER:  I think looking at the video -- and,

21   you know, I don't pretend to be an expert on what it looks like

22   to be under the influence of -- of a drug while deciding to

23   conduct oneself as Mr. Willden did that day.  I can say that

24   his conduct happens over a span of time, that, you know -- I

25   don't know what he was under the influence of when he walked

1    into the Capitol Building, but he brought goggles already.  So

2    he was already, in the government's mind, anticipating some

3    trouble that day, anticipating engaging with others.

4         Looking at his conduct, he's walking around in a very

5    controlled manner.  He's not seemingly experiencing some sort

6    of uncontrollable rage.  He doesn't seem to be dealing with a

7    range of emotions.  He seems to be very focused on being in an

8    area, maneuvering closer, picking up his phone to film things;

9    spraying the officers; throwing the can; more than 20 minutes

10   later, I think, walking into the building.

11        So, of course, while the Court may consider the

12   representations that Mr. Willden has made through counsel --

13   and the government has no reason or no ability to -- to doubt

14   those representations -- I don't think that they contribute

15   significantly to the conduct that Mr. Willden set out to engage

16   in that day.

17        THE COURT:  So let me ask you this question that

18   isn't addressed in either of the parties' pleadings, which is:

19   There's information in the record that Mr. Willden also

20   attended the Proud Boys event that took place in December of

21   2020.  And I know that there was violence during that time

22   period as well.  In fact, that's when the head of the

23   Proud Boys, Mr. Tarrio, was arrested.  Do you have any

24   information about Mr. Willden for that event?

25        MS. BUCKNER:  The government does not, Your Honor.

1   I -- and I can tell you, I -- through our search warrants, we

2   were not able to find much indicia of Mr. Willden's affiliation

3   with the Proud Boys.  We were able to, through investigation,

4   independently confirm that he appeared to be an active member

5   in California and had been for some time.  We were able to

6   confirm photos of him with individuals like Mr. Tarrio in the

7   past and -- and at other rallies.

8        One of the reasons we have declined to make any comment

9   on the concerned citizen's information is that we weren't

10  ourselves able to independently verify what's represented,

11  aside from the links that are provided, what was represented in

12  that memorandum, but we have no reason to doubt it.

13       So while there's a clear affiliation with Proud Boys

14  that has been going on for some time, we were not able to, sort

15  of, link that affiliation to the events of January 6 or

16  Mr. Willden's intent when getting onto the plane to

17  Washington, D.C., on January 6th.

18            THE COURT:  Any other points you want to make?

19            MS. BUCKNER:  I think I do, just briefly, Your Honor,

20  want to talk about the unwarranted disparities, as far as

21  sentencing.  I know that in the defendant's reply, he mentions

22  a couple of cases.  I believe *Miller* was one of them, and I

23  think -- in both cases, as far as mitigation, that are

24  mentioned through counsel, I think it's important to note that

25  there was a significant amount of remorse in those cases and

1    that the defendants in those cases were younger.

2         Here, Mr. Willden is nearly 40 years old.  He's had a

3    family, a job.  And while there are addiction issues, this is

4    not the case where he didn't know right from wrong.  This isn't

5    a case where he's a pawn.  This is a case where he walked up to

6    a building, put on goggles, and sprayed officers.

7         And I think the government wants to stress that given

8    the aggregate of his conduct -- while no individual factor led

9    to increased enhancements as far as obstruction or a dangerous

10   weapon or things like that -- we believe in the aggregate that

11   the top of the sentencing guideline is appropriate here.

12         THE COURT:  All right.  In looking at the chart, the

13   government's chart, that lists all the convictions and focusing

14   in on the 111 comparators, if -- like they do in the Olympics,

15   if you throw out the high and the low -- the low being

16   Judge Friedrich's six-month sentence, and then Judge Lamberth

17   sentenced someone at the top of the guidelines -- it seems to

18   me that all of the convictions -- or the sentences cluster

19   around a range from about 20 percent below the low end of the

20   guidelines and 20 percent above the high -- the low end of the

21   guidelines as well.  In fact, you know, probably the most

22   common is the low end of the guidelines sentence within that

23   range.

24         Do you have a different view of what those numbers

25   reflect or what the chart reflects?

1          MS. BUCKNER:  I do have a slightly different view.  I

2   think it's because in -- in looking at the disparities, I sort

3   of narrow down the conduct in the government's memorandum to

4   what I thought was comparable to this case.

5          And I -- so -- and so I think narrowing down the conduct

6   to what I think are the most comparable factually, and I

7   understand that Your Honor doesn't have the facts of every

8   single case in the chart so it's, sort of, hard to -- you know,

9   when you're dropping the high and the low figure out what makes

10  the most sense.

11         I tried to specifically point out multiple matters

12  because those were cases where officers were sprayed and then,

13  you know, compare those to cases where officers were physically

14  attacked versus an object or another weapon of opportunity

15  being used.

16         And I think when looking at that range, I think it's --

17  there's a difference.  I think from the government's

18  perspective, between individuals who took advantage of a moment

19  and struck an officer with their hand versus individuals who

20  picked up something that was around them -- such as a fire

21  extinguisher, for instance, which, to some extent, is a weapon

22  of opportunity -- from those individuals like Mr. Willden who,

23  at least the government believes, came on with goggles and

24  prepared to spray a chemical irritant.

25         And so I think that's why, from the government's

1    perspective, the low end of the range is not appropriate here,

2    and that is, I think, in conjunction with the fact that he's

3    already getting the benefit of no enhancement for a dangerous

4    weapon.

5            THE COURT:  Okay.  But the no enhancement for a

6    dangerous weapon is a result of what the government is able to

7    prove?

8            MS. BUCKNER:  Correct, Your Honor.

9            THE COURT:  All right.  Any other points you want to

10   make before I turn it over to Mr. Estes?

11           MS. BUCKNER:  No, Your Honor.

12           THE COURT:  All right.  Thank you.

13       Go ahead, Mr. Estes.

14           MR. ESTES:  Thank you, Your Honor.

15       I'm asking the Court to adopt the sentence that I set

16   forth in -- in my sentencing papers.  I think it's one that is

17   both sufficiently punitive and will allow Mr. Willden to -- to

18   continue to grow from his period of incarceration.

19       And, you know, I don't want to repeat what I've said in

20   those papers, but what I'm trying to emphasize there is that

21   Mr. Willden's path to the Capitol on January 6th was influenced

22   by a host of environmental factors, from a toxic rela- -- from

23   a toxic childhood to a toxic relationship with controlled

24   substances to a, sort of, toxic culture that weaponized, you

25   know, exaggerated conceptions of personal and political loss.

1          But what I do want to share in these comments is

2     something that, you know, I've learned about Mr. Willden in --

3     over the course of my representation of him, and -- and I think

4     it's, of course, why the Court should follow my proposed

5     disposition.  And -- and what that is is that Mr. Willden's

6     time incarcerated -- this is his first time incarcerated.  And

7     I think it's -- it's been a true wake-up call for him and, sort

8     of, been a marked change in his lifetime.

9          This is the first time in a long time that he's been

10    able to experience a period of stability, a period of sobriety,

11    a routine like he hasn't had before.  And the sentence I'm

12    asking for, which includes a substantial period of

13    incarceration, is to continue -- continue that trend.  You

14    know, we've identified an inpatient program that Mr. Willden

15    could attend after he's released from the Bureau of Prisons,

16    and I think, ultimately, that would be to his benefit and to

17    the community's benefit.

18         You know, I've known Mr. Willden in, essentially, two

19    environments.  One, prior to his plea when Mr. Willden was out

20    of custody and he was clearly struggling with the substance

21    abuse then; and then after his plea, when he's been in jail.

22    And over that time, I think the -- you know, the change in his

23    environment has provided, you know, a change in his outlook on

24    life.  He's been more retrospective, and I think he's

25    recognized how the -- you know, the life he was leading prior

1    to January 6th and prior to any incarceration contributed to

2    the personal circumstances that he's in currently.

3         You know, now that he's been incarcerated, I think --

4    you know, I've come to know the side of Mr. Willden that is

5    reflected in the letter that his family submitted.  You know,

6    he's a much warmer person than the person who, you know, was

7    present at the Capitol on January 6th.  And, you know, it's

8    that person that I hope that this Court will -- will see when

9    imposing sentencing.

10        You know, the only thing that changed in Mr. Willden

11   over the course of my representation of him, there's one thing

12   that's been, you know, truly constant, and that's been just his

13   sense of remorse, regret, disbelief about the conduct on

14   January 6th.  You know, throughout this process he made no

15   attempt to skirt responsibility or justify his conduct, you

16   know.  Early on in this proceeding, he -- he, you know, told me

17   he wanted to apologize to the officers who were involved in the

18   incident and, you know, it's, suffice to say, you know, more

19   than regrettable.

20        You know -- you know, unless the Court has any other

21   questions for counsel, I'd submit on those comments, my moving

22   paper, and -- and let the Court sentence him to the 12 months

23   and a day followed by a mandatory inpatient program.

24             THE COURT:  Do you want to make any comment on the

25   question I asked Ms. Buckner about whether he came to the event

1    from California with the goggles and the spray?

2                MR. ESTES:  No.

3                THE COURT:  Okay.

4           All right.  Does Mr. Willden wish to address the Court?

5                MR. ESTES:  He does.

6                THE COURT:  Okay.  Go ahead, Mr. Willden.

7                THE DEFENDANT:  Thank you, Your Honor.

8           Sorry.  Everyone told me this would be hard once --

9    once -- once you ask me to speak.  So bear with me.

10          I mean, I think my attorney knows me best of all through

11   all of this.  I'm not playing a victim here at all.  I never

12   have.  Anybody that -- and since I've been incarcerated -- that

13   I've talked to will tell you the same thing.  I know why I'm

14   here.  I know exactly why I'm here.  But, you know, I -- I'm

15   going to make the best of it no matter what.  So --

16                (Indiscernible due to technological issues.)

17                THE DEFENDANT:  No hard feelings at all.  I --

18                THE COURT:  Mr. Willden, you froze up a little bit.

19   The last thing I heard was you're going to make the best of it

20   no matter, and then you froze.

21                THE DEFENDANT:  Oh, okay.  Yeah, so the most

22   important thing to me is that I'm -- I'm very sorry to those

23   officers.  I really am.  I wish I could say that to them.  I

24   know it's hard saying it in a courtroom and just writing it

25   down.  But I'm grateful every day that no one was hurt,

1    especially seriously hurt, from my actions and that, in itself,

2    is a blessing.

3          And I choose to look at that as this is an opportunity

4    for me to move forward.  Like my attorney said, I haven't had a

5    chance to actually --

6          (Indiscernible due to technological issues.)

7          THE DEFENDANT:  -- officers are okay.

8          THE COURT:  Mr. Willden, you froze up again.  So you

9    said you hadn't had an opportunity to actually, and then you

10   froze.

11         THE DEFENDANT:  Yeah.  -- to, you know, actually --

12   to sit and think -- since my entire life.  I mean, I left home

13   at 14 years old.  My wife got pregnant when we were 17.  We

14   were together for 23 years.  It's always been bills and kids

15   and -- I've got some with autism, diagnosed when we were

16   20 years old, therapy, and --

17         I've actually been able to think and relax for the first

18   time in my life, and I know it's a bad place to do it, but, you

19   know, God works in mysterious ways, I suppose.  But this is --

20   most important to me, that I just want to thank the Court for

21   their time and the effort they've put into my case, and I

22   apologize that they had to.  It is my -- my fault that we're

23   here, my responsibility, and I'm just truly grateful that those

24   officers are okay.

25         THE COURT:  All right.  Thank you.

1        So, Ms. Buckner, I haven't seen anything from any of the

2    officers or anyone else claiming to have been a victim; is that

3    right?

4        MS. BUCKNER:  That's correct, Your Honor.  We did

5    notify the specific officers identified by initials.  I ensured

6    that they were aware of the hearing.  None of them wished to

7    provide a victim impact statement.

8        THE COURT:  Okay.  Thank you.

9        So let's start with some of the financial issues.  So

10   the -- with respect to restitution, the parties have agreed to

11   a $2,000 payment through the Clerk of the Court to be forwarded

12   to the Architect of the Capitol.  And so I will go ahead and

13   order that.

14       With respect to a fine, there's a maximum fine under the

15   statute of $250,000.  The guidelines range is 10,000 to 95,000.

16   Probation has indicated that the defendant does not have an

17   ability to pay a fine, and I concur.  The defendant is not

18   gainfully employed and provided no financial information

19   indicating an ability to pay; therefore, I don't intend to

20   impose a fine.

21       So the Court is to impose a sentence sufficient but not

22   greater than necessary to comply with the purposes set forth in

23   the subsection.  I'm to consider the nature and circumstances

24   of the offense, and the history and characteristics of the

25   defendant, and impose a sentence that reflects the seriousness

1    of the offense, promotes respect for the law, and provides just

2    punishment for the offense.

3        Of course, the offense is very serious.  A number of my

4    colleagues have spoken eloquently about this.  Defendant took

5    part in a mob riot that took place on -- at the Capitol on

6    January 6, 2021.  Many of the rioters, including the defendant,

7    engaged in violence and some destroyed property.  I have

8    watched numerous videos of rioters engaging in hand-to-hand

9    combat with police officials.  It was not a peaceful event.

10   More than a hundred law enforcement officers were injured on

11   that day.  Moreover, the Capitol sustained over $1.5 million in

12   property damage.

13       Many of the rioters intended to block the certification

14   of the votes for President Joe Biden, and although the rioters

15   failed to block that certification, they delayed it for several

16   hours.  The security breach forced lawmakers to hide inside the

17   House gallery until they could be evacuated to undisclosed

18   locations.  In short, the rioters' actions threatened the

19   peaceful transfer of power, a direct attack on our nation's

20   democracy.

21       And the defendant fits comfortably within the group of

22   rioters that actually attacked law enforcement.  He came to the

23   event with goggles and at some point got ahold of a chemical

24   spray, making at least part of his actions partially

25   premeditated.  In confronting the U.S. Capitol Police officers

1    outside the east Columbus doors, he raised a green canister and

2    sprayed the officers with chemical irritants.  When the can was

3    empty, he threw the can at the officers.

4         His assault on these officers guarding the doors helped

5    facilitate the eventual breach of those doors.  And once

6    breached, a short time thereafter, the defendant entered the

7    Capitol Building through those same doors and walked towards

8    the Rotunda.  He walked around the Rotunda and exited after

9    remaining in the building for about 18 minutes.

10        He later posted a Facebook message celebrating his

11   actions on that day.  To his credit, he pleaded guilty at an

12   early juncture, but the Court is concerned that defendant has

13   likely deleted electronic evidence from his mobile phone and

14   Facebook account.

15        As previously indicated, defendant has no criminal

16   history, but his record does suggest some level of domestic

17   violence, and one such charge appears to remain pending.

18        Defendant is a 41-year-old man, self-described member of

19   the Proud Boys, with a high school equivalency.  He appears to

20   have been gainfully employed much of his adult life, at one

21   time recently earning a good salary while running an insurance

22   business with his now estranged wife.

23        Defendant's childhood, to say the least, was extremely

24   difficult.  His parents divorced when he was 2, and his

25   parents' relationship was tumultuous even before then.  His

1   father physically abused his mother on a number of occasions

2   and at times physically attacked defendant once brutally.  His

3   father was a long-time drug user that eventually committed

4   suicide in 2020 by shooting himself in the chest.  He was

5   absent for much of the defendant's life.

6        And although defendant's mother married a more stable

7   father figure to which the defendant grew close, upon

8   dissolution of that relationship, that man exited defendant's

9   life completely.

10       Defendant's mother also used drugs and struggled

11  financially, causing the family to move a number of times.  She

12  was often absent, leaving defendant and his siblings to fend

13  for themselves a great deal of the time.  At one point she

14  relinquished parental rights.

15       Defendant, thus, gravitated to his older brother who,

16  along with his friends, brought drugs into the household.

17  Eventually, defendant left the house in his teens to live with

18  his father, but his father's drug use and volatility did not

19  provide a better environment.  And his father kicked him out

20  three months later, leaving defendant with no fixed place to

21  live for a year.

22       Defendant's situation did not improve until he met his

23  wife in high school, and he fathered his first child at age 18.

24  But the pattern of domestic violence allegations suggest that

25  this relationship was not necessarily ideal either.

1          Later, defendant's brother was killed as a result of a

2   work-related car accident, greatly impacting the defendant's

3   emotional well-being.

4          Defendant has had a very serious drug problem for

5   most -- most of his teenage years through adulthood.  He has

6   abused methamphetamines as well as cocaine, opioids,

7   barbiturates, and hallucinogenic substances.  His drug abuse

8   started at the age of 14, and although he has experienced

9   periods of sobriety, he has fallen off the wagon frequently.

10          He overdosed on meth in 2019, and his consumption

11   reportedly became worse after his brother's death; and he

12   claims he was using several narcotic drugs during the time

13   period of the current events.

14          In fact, after January 6th, he was even unable to

15   maintain sobriety during his pretrial release, and this, in

16   large part, caused the revocation.

17          Perhaps because of his family history and/or drug abuse,

18   defendant also experiences mental health challenges.  He

19   reports he suffers from depression and anxiety, and his medical

20   expert has also suggested he might suffer from bipolar disorder

21   as well.  These challenges were exacerbated by the traumas and

22   deaths he has experienced, and he claims some of his drug usage

23   were attempts at self-medication.

24          The defendant has been married for many years, although

25   that relationship seems to be in the process of dissolution.

1    The marriage resulted in two children.  One of these children

2    has special needs for which the defendant has provided much

3    hands-on support.  Whether he has a sufficiently stable home

4    and work environment and familial support to facilitate his

5    rehabilitation upon release is yet to be seen.

6         The Court is to impose a sentence that affords adequate

7    deterrence to criminal conduct and protects the public from

8    further crimes of the defendant.  The events of January 6th

9    involve the rather unprecedented confluence of events spurred

10   by then-President Trump and a number of his prominent allies

11   who bear much responsibility for what occurred on that day.

12        Since his arrest, however, defendant did not do well

13   while on release status, and his release status was eventually

14   revoked.  He incurred eight location-monitoring violations,

15   stalled providing urine samples on seven occasions, failed to

16   test on seven occasions, admitted to using methamphetamines on

17   three occasions, cut off his ankle bracelet, and eventually

18   lost contact entirely.

19        Due to defendant's history of violence, his association

20   with the Proud Boys, an aggressive group, and his inability to

21   comply with his pretrial release conditions, the Court is

22   concerned that Mr. Willden will reoffend, will be emotionally

23   swept up in irrational actions, or will be an ongoing risk to

24   the public.

25        With respect to general deterrence, the Court believes

1    that further incarceration is necessary to deter, potentially,

2    any violent protesters from resolving their political disputes

3    through the use of violence rather than peaceful demonstration.

4        The Court is to impose a sentence that provides the

5    defendant with needed educational or vocational training,

6    medical care, or other correctional treatment in the most

7    effective manner.

8        As reflected in the presentence report, defendant's

9    long-standing substance abuse requires drug testing and

10   treatment, both while in BOP custody and during the supervision

11   after release from custody.  His medical expert's report also

12   suggests that mental health treatment is necessary and

13   appropriate.  As recommended by probation, while in BOP

14   custody, the Court will recommend the Parenting Program, the

15   Drug Abuse Education program, the Nonresidential Drug Abuse

16   Program, and the Residential Drug Abuse Program.

17       The Court will not directly order the participation in

18   the program suggested by defendant because that organization --

19   that organization indicates that they do not allow mental

20   health medications, which seems to contradict the advice of the

21   medical expert, and the program also requires a blackout period

22   with no contact that is incompatible with the appropriate

23   supervision by the probation office.

24       The Court is to consider the kinds of sentences

25   available.  Given the nature of the crime, the defendant's

1   violence, and his inability to comply with his pretrial release

2   conditions, the Court is only considering further

3   incarceration.

4        The Court is to consider the kinds of sentences and the

5   sentencing ranges established for the applicable category of

6   offense committed by the applicable category of defendant as

7   set forth in the guidelines.  The Court has considered the

8   applicable guidelines.  No pertinent policy statements issued

9   by the Sentencing Commission have been brought to my attention.

10        The Court is to impose a sentence that avoids

11  unwarranted sentence disparities among defendants with similar

12  records who have been found guilty of similar conduct.  The

13  government has provided a chart that lists a number of the

14  January 6th defendants -- defendant sentencings.  I have

15  closely analyzed the other January 6th defendants who were

16  convicted under 18 U.S.C. § 111 by researching the dockets in

17  those cases, including the applicable guidelines ranges.  The

18  parties have also provided useful comparator information in

19  their respective sentencing memoranda.

20        As I indicated earlier, the Court makes the observation

21  that if one knocks out the longest sentence and the lowest one,

22  the others group around the range of 20 percent below and

23  20 percent above the applicable low end of the guidelines for

24  each particular offender.  But the Court notes that defendant's

25  guidelines were lower than other comparators because the

1  government could not analyze the chemical spray that defendant

2  utilized.  The Court also recognizes that probation has

3  recommended a low-end guideline sentencing.

4       The Court is to impose restitution, and we've already

5  addressed that with the $2,000 agreed to by the parties.

6       So I will now indicate the sentence to be imposed but

7  will give counsel one more opportunity to make any legal

8  objections before the sentence is actually imposed.

9       Mr. Estes, do you have any objections to any of the

10  factors I've considered?

11           MR. ESTES:  I don't.  I just note that the -- the

12  allegations of domestic violence are very recent.  So I think

13  it's -- he had a long marriage that was relatively good.

14           THE COURT:  Ms. Buckner, do you have any objections

15  to any of the factors I've considered?

16           MS. BUCKNER:  No, Your Honor.

17           THE COURT:  So I'll start by noting that defendant

18  was -- his pretrial release was revoked on April 7, 2022.  So

19  he has served already about four months, for which he will

20  receive credit.

21       All right.  Mr. Willden, it is the judgment of the Court

22  that you, Ricky C. Willden, are hereby committed to the custody

23  of the Bureau of Prisons for a term of 24 months on Count 2.

24  You are further sentenced to serve a 36-month term of

25  supervised release as to Count 2, and you are further ordered

1    to pay a special assessment of a hundred dollars by -- as

2    required by statute.

3        The Court finds that you do not have the ability to pay

4    a fine and, therefore, does not impose one.  You are ordered to

5    make restitution through the clerk's office to the Architect of

6    the Capitol in the amount of $2,000.  The financial obligation

7    shall be paid at a rate of no less than $100 per month upon

8    release.

9        The special assessment and restitution are payable to

10   the Clerk of the Court.  And within 30 days of any change of

11   address, you shall notify the Clerk of the Court of the change

12   until such time as the financial obligation is paid in full.

13       While on supervision, you shall submit to collection of

14   DNA.  You shall not possess a firearm or other dangerous

15   weapon, and you shall not use or possess an illegal controlled

16   substance, and submit to one drug test within 15 days of

17   placement on supervision and at least two periodic drug tests

18   thereafter.

19       And you shall not commit another federal, state, or

20   local crime.

21       You shall also abide by the general conditions of

22   supervision adopted by the U.S. Probation Office, which will be

23   set forth in the judgment and commitment order, as well as the

24   following special conditions:

25       As I indicated, there will be substance abuse treatment,

1    and that will be set forth in the judgment and commitment

2    order, and will include substance abuse testing as well and

3    mental health treatment as well.  And all those things were set

4    forth in the presentence report in advance of this hearing; so

5    I won't repeat them.

6         That will also include cognitive behavioral treatment,

7    and then there will be a financial information disclosure,

8    which will be in place until the financial requirements are --

9    are paid in full.

10        Counsel, is there any reason other than those reasons

11   already stated and argued why the sentence should not be

12   imposed as just stated?

13             MS. BUCKNER:  Not from the government, Your Honor.

14             MR. ESTES:  No, Your Honor.

15             THE COURT:  All right.  Mr. Estes, were you going to

16   request placement somewhere?

17             MR. ESTES:  Nothing specific.

18             THE COURT:  Okay.  Mr. Willden, do you prefer that I

19   recommend something out in the West Coast so you're closer to

20   family?

21             THE DEFENDANT:  Actually, Judge, I had put in a

22   request of my attorney for Florida, if possible, away from

23   people I've -- where I grew up.

24             THE COURT:  Yeah.

25             THE DEFENDANT:  Get a fresh start.

 1              THE COURT:  All right.  I'll put in that

 2     recommendation.

 3              So, Ms. Buckner, the -- I know there's charges that need

 4     to be dismissed.  It was a little bit unclear to me.  I assume

 5     he pleaded guilty to Count 2 of the superseding indictment; is

 6     that right?

 7              MS. BUCKNER:  That's correct, Your Honor.  And the

 8     government --

 9              THE COURT:  The original indictment and then Counts 1

10     and 3 through 8 of the superseding indictment need to be

11     dismissed?

12              MS. BUCKNER:  Yes, Your Honor.

13              THE COURT:  Okay.  We'll go ahead and do that.

14              All right.  After conviction, Mr. Willden, you were

15     convicted by a plea of guilty.  You can appeal your conviction

16     if you believe that your guilty plea was somehow involuntary or

17     if there's some other fundamental defect in the proceedings

18     that was not waived by your guilty plea; although I'll note

19     that your guilty plea did contain a significant waiver of your

20     appellate rights.

21              You also may have a statutory right to appeal your

22     sentence under certain circumstances, and to the extent you're

23     inclined to have that sort of appeal, I would recommend you

24     consult with your attorney, and he can explain to you what may

25     or may not still be viable given the waiver in your plea

1   agreement.

2        If you do decide to appeal, you have the right to apply

3   for leave to appeal in forma pauperis.  That means without the

4   payment of costs.  And if you request and qualify, the Clerk of

5   the Court will prepare and file a notice of appeal on your

6   behalf, although I note that you're represented by very able

7   counsel who can assist you in that process.

8        But, most importantly, for these purposes, with few

9   exceptions, any notice of appeal has to be filed within 14 days

10  of the entry of the judgment.  Now, it's late on a Friday

11  afternoon.  So I'm certain that the judgment will not be

12  entered today, but, presumably, it will be entered early next

13  week.  So that's 14 days from that point, if you wish to

14  appeal.

15       Is there anything else we need to cover today,

16  Mr. Estes?

17            MR. ESTES:  Not from the defense.

18            THE COURT:  Ms. Buckner?

19            MS. BUCKNER:  Not from the government.

20            THE COURT:  Mr. Willden, good luck to you, sir.  Life

21  dealt you a very, very difficult hand.  There's no getting

22  around that point.  But things are in your hands now.  Use the

23  time to reflect.  I think it's commendable that you don't want

24  to be around people that are bad influences, and, you know,

25  certainly it seems like you have been associating with people

1    that are bad influences.  You certainly have to get your drug

2    problem under control, but that's a lifelong process, as you

3    know.  So good luck with that.

4              THE DEFENDANT:  Thank you, Your Honor.

5              THE COURT:  All right.  You're excused.  Thank you.

6              (Proceedings were concluded at 2:59 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          <u>CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER</u>

2

3               I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                         Dated this 1st day of September, 2022.

10

11                    /s/ Nancy J. Meyer
                      Nancy J. Meyer
12                    Official Court Reporter
                      Registered Diplomate Reporter
13                    Certified Realtime Reporter
                      333 Constitution Avenue Northwest
14                    Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25